## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



**FILED**

Feb 09 2017, 8:24 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEYS FOR APPELLANTS

FOR MOTHER

Erin L. Berger
Evansville, Indiana

FOR FATHER

Julianne L. Fox
Vanderburgh County
Public Defender's Office
Evansville, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Robert J. Henke
James D. Boyer
Deputy Attorneys General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

In the Matter of the Termination of the Parent-Child Relationship of T.P., Mother, S.R., Father, and B.R., Minor Child,

T.P. and S.R.,

*Appellants-Respondents,*

v.

Indiana Department of Child Services,

*Appellee-Petitioner.*

February 9, 2017

Court of Appeals Case No. 82A01-1606-JT-1275

Appeal from the Vanderburgh Superior Court

The Honorable Brett J. Niemeier, Judge

Trial Court Cause No. 82D04-1601-JT-75

**Kirsch, Judge.**

[1] T.P. ("Mother") and S.R. ("Father") appeal following the involuntary termination of their parental rights to their daughter, B.R. ("Child"). On appeal, Mother and Father each contend that the Indiana Department of Child Services ("DCS") presented insufficient evidence to support the termination of their parental rights.

[2] We affirm.

## Facts and Procedural History

[3] Mother and Father are the biological parents of Child, who was born on June 10, 2014. Both Mother and Father (together, "Parents") are persons with intellectual disabilities, and each suffers from mental or cognitive issues. At the time of Child's birth, a doctor at the hospital, who "had concerns regarding the parents' ability to be able to parent," contacted DCS and requested an evaluation as to whether it was safe to let Child go home with Parents. *Tr.* at 127. Child was initially removed from Parents care on June 12, 2014 and placed in foster care, prompting DCS to file Cause No. 82D01-1406-JC-319, DCS's first petition alleging that Child was a child in need of services ("CHINS").[1] At that time, Parents lived with Mother's parents, Carolyn

---

[1] During the evidentiary hearing on the termination, the juvenile court took judicial notice of the first CHINS case. *Tr.* 126-27. Nevertheless, we are unable to locate in the record before us any documents pertaining to that case.

("Grandmother") and Ed ("Grandfather") (together, "Grandparents"), in Grandparents' home in Vanderburgh County, Indiana. On July 16, 2014, Child was placed in Grandparents' home under Grandmother's care. There, Parents' interaction with Child had to be "supervised all the time." *Id.* at 127.

[4] In mid-September 2014, citing safety concerns, DCS removed Child from Grandparents' home and filed a second CHINS petition, Cause No. 82D04-1409-JC-608. DCS had concerns about Parents' ability to safely care for Child and about Child's safety if she remained in Grandparents' home. Subsequent to Child's initial placement in Grandparents' home, DCS learned that Grandfather was a registered sex offender and that Grandmother "had DCS history concerning her own children." *Id.* at 128. In light of the second CHINS case, the juvenile court ("CHINS court")[2] granted DCS's motion to dismiss the first CHINS case.[3] At that time, Child was placed back in foster care, where she resided throughout the CHINS and the termination proceedings.

[5] At its November 12, 2014 initial hearing, the CHINS court adjudicated Child a CHINS on Parents' stipulation and denied Parents' request that Child be placed back in Grandmother's care. In its November 2014 Order on Initial Detention

---

[2] We use the term "CHINS court" when referring to CHINS proceedings, and we use the term "juvenile court" when referring to termination proceedings.

[3] During the evidentiary hearing on the termination, DCS requested that the juvenile court take judicial notice of this second CHINS case, and DCS moved to admit DCS Exhibit 4, which included CHINS documents such as DCS's Report of Preliminary Inquiry. *Tr.* at 126-27. The juvenile court took that motion under advisement, but did not rule on the admissibility of *DCS Exhibit* 4. The contents of that proposed exhibit are not in the record before us.

Hearing, the CHINS court found: (1) Parents lack the ability to care for Child's needs; (2) at the time of Child's birth, doctor expressed concern about Mother's ability to care for Child; (3) Mother did not follow through with doctor's basic recommendations during pregnancy; (4) "doctor [was] concerned about [M]other feeding [C]hild and stated that [C]hild would be at risk in [P]arents' care"; (5) even with services, Parents continue to need constant assistance to care for Child; (6) Parents reside with Grandfather, who was convicted of four counts of child molesting in 2000, has substantiated DCS sex abuse history, and has a "DCS history for neglect"; (7) as part of Grandfather's probation, he cannot be unsupervised around children, other than his own, who are under the age of sixteen; (8) Grandmother "has substantiated DCS history for neglect" on at least three occasions. *DCS Ex*. 3 at 21-22. The CHINS court noted that Parents and Grandparents are unable to protect and supervise Child, "or to provide appropriate safe environment" for Child, thereby placing Child "in danger of physical or mental harm." *Id*. at 22. Specifically, the CHINS court stated:

> [I]t is in the best interests of the child to be removed from the home environment and remaining in the home would be contrary to the health and welfare of the child because of the allegations admitted, of an inability, refusal or neglect to provide shelter, care, and/or supervision at the present time and the child needs protection that cannot be provided in the home.

> The Court finds that reasonable efforts were made by DCS to prevent or eliminate the need for removal of the child. The statements of reasonable efforts as set forth in the pleadings,

reports, and documents of DCS and/or all other service providers filed herein are incorporated by reference.

*Id.*

[6] The CHINS court held a dispositional hearing on December 3, 2014 and ordered Parents to participate in reunification services. In its dispositional order, the CHINS court ordered Parents to: (1) cooperate with "parent aide programs"; (2) attend outpatient therapy; (3) attend nurturing classes; (4) submit to random drug screens; (5) participate in supervised visitation; and (6) remain alcohol free. *Id.* at 12.

[7] About a year later, on January 11, 2016, DCS filed a petition with the juvenile court to terminate Mother's and Father's parental rights to Child. *Appellant's App.* at 20-21. The two-day evidentiary hearing began on February 3, 2016 and, on that first day, exhibits were introduced and admitted, but no testimony was heard. The balance of the hearing was held on April 21, 2016, where Parents, Grandparents, and six other witnesses testified. The first to testify was Marissa Curry ("Curry"), a service provider for Ireland Home Based Services ("Ireland Services") who had been Parents' "visit supervisor" since August 2015. *Tr.* at 14. Curry testified that she supervised visits between Parents and Child once a week for two hours per visit, with visits being separate for each parent. *Id.* During those visits, Curry worked with Parents on general parenting skills, including, feeding, appropriate interactions, and engagement with Child. *Id.* at 15. Curry testified that Father is affectionate toward Child, says he loves and misses her, and brings snacks to each visit. While Parents attended most of the

visits, Curry continued to have concerns about Child's safety because Parents were not aware of and did not pay attention to Child. For example, Parents had to continually be alerted to choking hazards with Child's food and toys and reminded that Child could get hurt climbing on objects in the room. *Id.* Curry noted that she had observed each parent continuing to feed Child, unaware that Child still had food in her mouth. *Id.* at 30, 31. During visits, Parents sometimes stared into space or would lie on the floor and sleep, and Curry had to direct them to sit up and become engaged. *Id.* at 17, 27. Mother was approved for a visit with Child in the community; however, no community visit was held because Curry had safety concerns about Mother's reaction to additional distractions and other environmental stimuli. *Id.* at 17, 23. While no community visit was ever requested for Father, Curry testified that she had the same safety concerns, as with Mother, for visits with Father in the community. *Id.* at 26. Curry had never seen Father verbally aggressive toward Child, but on one occasion Father was rough putting on Child's shoes, and Curry had to intervene. *Id.* at 28. Curry testified that she was unsure how much Parents comprehended when she redirected their behavior, and she was concerned that Parents could not retain parenting information from one visit to another. *Id.* at 30. Curry opined that Child would not be safe left alone with either parent for an extended period of time. *Id.* at 17.

[8] Faye Goebel, Child's court appointed special advocate ("the CASA"), testified that she had attended "more than ten supervised visits," with Child and Parents, and she had also visited Child in her foster home. *Id.* at 35. The

CASA stated that she had safety concerns about Parents' ability to follow some instructions. She had observed, "on multiple occasions," Parents' inability to remember safety instructions and information from visit to visit, thus, requiring the CASA to give the same instructions repeatedly. *Id*. at 36. While noting that Parents regularly attended supervised visits and had a "fondness" for Child, the CASA testified that Parents', and especially Mother's, relationship to Child was more like that to "a favorite doll or a favorite toy." *Id*. Initially, Parents visited Child together. However, Parents did not get along with each other, and, after their situation became "very volatile," the visits were split. *Id*. at 40. The CASA admitted that this is a difficult case because the Parents, "from their heart," would like to parent Child. *Id*. at 43. The CASA testified that Mother was able to change Child's diapers, provide a sippy cup, use bibs, and provide food and activities for Child, but it was not clear how much Mother was able to retain. *Id*. at 46-47. The CASA believed that Mother had "an inability to comprehend ... on an emotional level" and that "cognitive impairment" and Parents' "own environment" were factors. *Id*. at 48-49. The CASA opined that, of the two, Father seemed to do a better job of parenting and had a better bond with Child than Mother. *Id*. at 53. Even so, the CASA concluded that, based on what she had observed and the information she had gathered about Child, it was in Child's best interests that the parental rights of both Mother and Father be terminated. *Id*. at 37. Child had been in the same foster home since she was three months old, and the CASA reported that she was doing "extremely well" and "progressing very well" in all aspects. *Id*. at 38. Accordingly, the future plan was that foster parents would adopt Child. *Id*.

[9]     Marla Minton ("Minton"), a licensed clinical social worker and lead therapist for ViewPointe Counseling, had been Mother's therapist since December 2014. Minton testified that Mother had an adjustment disorder, intermittent explosive disorder with depression, and intellectual disabilities. *Id*. at 58. Mother, who cannot attend to her own hygiene, attended counseling sessions without having bathed; she had body odor, and her clothes were not clean. *Id*. at 59, 63. Mother could not remember when she had last bathed. *Id*. at 63. Mother took parenting classes, but could remember nothing other than, "To be a good parent is to be good to the kid and not scream at her." *Id*. at 60-61. Minton testified that there is little improvement in Mother, who still does not know: (1) how to bathe Child; (2) how to put Child on a schedule; (3) how often Child needs to sleep; and (4) how much and how frequently Child needs to eat. *Id*. at 62. Minton admitted that intellectual functioning alone does not disqualify Mother from being able to care for Child. However, Mother has limited insight, she is very immature, and her intermittent explosive disorder is not under control. *Id*. Minton testified that the chaotic and argumentative home environment that Mother has chosen to stay in will likely not change. *Id*.

[10]    Amber Freels ("Freels"), a clinical social worker for ViewPointe Counseling, had been Father's outpatient therapist since August 2014. Freels testified that Father suffers from intermittent explosive disorder and "flies off the handle for the smallest things." *Id*. at 69-70. Father also suffers from an adjustment disorder with depression, in part due to Child's removal from his care. *Id*. at 69. Father described his home-life with Grandparents as chaotic because

people in the home yell and fight, and the police have been called to Grandparents' home on many occasions. *Id.* at 70. Freels testified that Father's anger is exacerbated by others in the home. *Id.* at 71. She reports that Father has a "below normal level of functioning." *Id.* Father was resistant to the idea of group home settings, and Freels testified that she was not aware that Father had ever lived on his own. *Id.* at 75-76. Father spoke with Freels about the parenting classes he was taking, and when asked whether he could describe anything from the class, Father said he did not really need the class because "he knew how to take care of his baby." *Id.* at 78. Father was motivated to be a father, had set money aside for his daughter, and never missed visits. *Id.* Freels testified that Grandmother initially attended the counseling appointments with Father; however, that stopped because Grandmother "appeared to be negative toward [Father]." *Id.* at 80. Father remembered his appointments with Freels, and if he cancelled, he had a valid reason. *Id.* at 80-81.

[11] Dr. Jessica Huett ("Dr. Huett"), a psychologist with Associates in Counseling and Psychotherapy, completed a clinical psychological evaluation on Mother and Father in November 2015. Dr. Huett testified at the evidentiary hearing that Mother has "other specified impulse control disorder," and a history of anger outbursts. *Id.* at 90. Test results revealed that Mother has an IQ of 53, which equated to "the 2nd grade level across the skill level." *Id.* at 91-93. Dr. Huett concluded that Mother "would need a very strong support system to be able to be a primary custodian of a child due to her intellectual level and also the anger and impulse control issues." *Id.* at 91-92. Regarding Father, test

results revealed that he has an IQ of 59, "basically a 3rd grade academic level in basic academic tests." *Id*. at 92. Dr. Huett found Father to be cooperative, and he "was easy to establish a rapport with." *Id*. at 99. She stated that Father, like Mother, gets angry easily, is immature when he communicates with others, has limited impulse control, and would need a very strong support system to take care of a child. *Id*. at 92-93. Dr. Huett testified that, while unable to provide an "age of maturity," Parents' "functioning was in the [lowest] first percentile compared to the general population and academically they are very limited." *Id*. at 93. On the basis of the evaluations, Dr. Huett indicated that Mother and Father's insight into parenting issues was "fairly limited." *Id*. at 94.

[12] DCS Family Case Manager, Loussa Numa ("FCM Numa"), had been the family's caseworker since August 2014. It was FCM Numa's responsibility to see Child at least once every thirty days and to make sure that Child was properly cared for. Originally, parents attended visitation together in Grandparents' home; however, at the end of June 2015, volatile arguments between the parents prompted FCM Numa to split the visits. *Id*. at 109. Other problems, including the "traffic" through Grandparents' home, resulted in visitation with Child being moved to Ireland Services. *Id*. at 120. FCM Numa testified that, in addition to visitation, Parents were provided with services, such as parent aides and counseling sessions, and were connected to vocational rehabilitation through their parent aides. *Id*. at 109. DCS also provided funds to allow Parents to each participate in a "psych evaluation." *Id*. At the time FCM Numa joined the case, in August 2014, Child was living with Parents in

Grandparents' house. *Id.* at 110. FCM Numa testified that, at one point, Grandfather and Father moved out of the home and lived together in an Evansville motel; however, by the time of the termination hearing, both men were again living in Grandparents' home.

[13] FCM Numa testified that she "talk[ed] to the family on a regular basis" and, when she got a call from Father or Mother, she would have to "talk to the whole family." *Id.* at 112. Sometimes during those calls, each member of the family would scream and curse at her. *Id.* at 113. FCM Numa testified that Parents argue with each other, yell and scream at each other, and if they "don't like what they are hearing, … they will storm out." *Id.* at 114. FCM Numa admitted that Parents are concerned about Child, and they would call FCM Numa to ask what kind of sippy cup they should use or what food Child would eat. *Id.* This desire to care for Child, however, did not remove FCM Numa's safety concerns. For example, during one visit, Child did not drink her milk, and one of the Parents brought the same cup of milk back to the next visit. *Id.* at 121. Another time, Child fell and was bleeding from her lip. Mother "freaked out" and did not know what to do. *Id.*

[14] FCM Numa shared with Parents her concern about them living with Grandparents. In addition to concerns about Grandfather's criminal history and Grandparents' DCS history, FCM Numa was concerned about the living arrangement since seven adults lived in the home, "there's always people in and out [of] the home," Grandparents always have different tenants, the family argues a lot and police are called, and the home has had issues with fleas,

roaches, and lice. *Id*. at 111-12. While Parents expressed a willingness to move out, FCM Numa testified that Parents changed their minds about housing constantly. FCM Numa had heard Mother say that "she has to stay with [Grandmother]," because Mother "needs [Grandmother] to help her with her daily things." *Id*. at 110. For Father, the inconsistency is reflected by the fact that, one day, Father claims that he is moving out with Grandfather, and the next day, he is not moving out. *Id*. at 111. The parent aide tried to help Parents find a new living arrangement, but Parents refused. *Id*. at 116.

[15] FCM Numa testified that Grandmother is the payee for Mother's Supplemental Security Income ("SSI"), and Mother has complained that Grandmother pays the household bills with that money. Mother works two days a week and, even though she does not work long hours, she gets tired. *Id*. at 119. It was FCM Numa's belief that Mother cannot handle working more hours. *Id*. at 118. FCM Numa testified that the best permanency plan for Child, and the one that would be in Child's best interest, would be "termination" and for Child "to be adopted." *Id*. at 122.

[16] Father testified that he visited with Child and would take diapers, baby wipes, and food, and he would use his own money to purchase toys for Child. *Id*. at 150. Father stated that he could live on his own and was in the process of moving; however, Father did not yet know where he would move. Father said that his SSI payments were made to Grandfather and that Grandfather was going to help Father with his finances. Father also expressed his desire to continue to be Child's parent, saying he believed he could provide for Child and

that he would "keep her out of the chaos that is the [Grandparents'] house." *Id.* at 152.

[17] Mother testified that she had always lived with Grandmother, but she planned to move out. *Id.* at 154. When asked if she had ever lived anywhere else, Mother answered, "No. Besides me being in foster care when I was little." *Id.* Mother expressed the desire to move into a place where Child could live with her. *Id.* at 155. Mother testified that she receives SSI on a monthly basis in addition to her paycheck from her job, but she did not know whether she would get her SSI check if she moved out, explaining, "That would be up to my mom." *Id.* Mother expressed a willingness to take more parenting classes, but believed that she would not have any trouble taking care of Child. *Id.* at 156.

[18] Grandmother testified that Mother had not spoken to her about plans to move out and find her own housing. *Id.* at 158. Grandmother conceded that Grandfather had a conviction for child molestation, but stated that he was no longer on probation. *Id.* at 163. Grandfather recognized that his convictions for child molestation could have impacted Parents' ability to have home visits with Child, and therefore, he moved out for a number of months. Grandfather stated that, when home visits did not materialize, he moved back into the home. *Id.* at 165.

[19] On May 31, 2016, the juvenile court issued an order terminating both Mother's and Father's parental rights. Mother and Father now appeal the termination of their parental rights to Child.

# Discussion and Decision

[20] "The traditional right of parents to establish a home and raise their children is protected by the Fourteenth Amendment of the United States Constitution." *In re J.W., Jr.*, 27 N.E.3d 1185, 1187-88 (Ind. Ct. App. 2015), *trans. denied*. "However, a trial court must subordinate the interests of the parents to those of the child when evaluating the circumstances surrounding a termination." *Id.* at 1188. Termination of a parent-child relationship is proper where a child's emotional and physical development is threatened. *Id.* "Although the right to raise one's own child should not be terminated solely because there is a better home available for the child, parental rights may be terminated when a parent is unable or unwilling to meet his or her parental responsibilities." *Id.*

[21] Before an involuntary termination of parental rights may occur, DCS is required to allege and prove, among other things:

> (A) that one (1) of the following is true:
>
> . . . .
>
> (iii) The child has been removed from the parent and has been under the supervision of a local office or probation department for at least fifteen (15) months of the most recent twenty-two (22) months, beginning with the date the child is removed from the home as a result of the child being alleged to be a child in need of services or a delinquent child;
>
> (B) that one (1) of the following is true:

(i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.

(ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.

(iii) The child has, on two (2) separate occasions, been adjudicated a child in need of services;

(C) that termination is in the best interests of the child; and

(D) that there is a satisfactory plan for the care and treatment of the child.

Ind. Code § 31-35-2-4(b)(2). DCS's burden of proof for establishing these allegations in termination cases is one of clear and convincing evidence. *K.T.K. v. Ind. Dep't of Child Servs.*, 989 N.E.2d 1225, 1230 (Ind. 2013). If the court finds that the allegations in a petition described in section 4 of this chapter are true, the court shall terminate the parent-child relationship. Ind. Code § 31-35-2-8(a).

[22] When reviewing a termination of parental rights issue, our court will not reweigh the evidence or judge the credibility of the witnesses. *In re R.S.*, 56 N.E.3d 625, 628 (Ind. 2016). We consider "only the evidence and any reasonable inferences therefrom that support the judgment," and give "'due regard' to the trial court's opportunity to judge the credibility of the witnesses firsthand." *K.T.K.,* 989 N.E.2d at 1229. Here, in terminating Parents' parental rights to Child, the juvenile court entered specific findings and conclusions.

When a trial court's judgment contains specific findings of fact and conclusions thereon, we apply a two-tiered standard of review. *In re R.S.*, 56 N.E.3d at 628 (citation omitted). First, we determine whether the evidence supports the findings, and second, we determine whether the findings support the judgment. *Id.* (citation omitted). We will set aside the trial court's judgment terminating a parent-child relationship only if it is clearly erroneous. *Id.* Findings are clearly erroneous only when the record contains no facts or inferences drawn therefrom that support them. *In re A.G.*, 6 N.E.3d 952, 957 (Ind. Ct. App. 2014). A judgment is clearly erroneous if the findings do not support the trial court's conclusions or the conclusions do not support the judgment. *Id.* If the evidence and inferences support the trial court's decision, we must affirm. *A.D.S.*, 987 N.E.2d at 1156.

[23] We begin by noting that Mother devotes her entire brief to the contention that she was entitled to accommodations under the Americans with Disabilities Act ("ADA"), suggesting that failure to accommodate her intellectual disability is a defense in this termination proceeding. *Mother's Br.* at 11-14. While Mother argues this on appeal, based on our review of the record before us, we find that Mother did not raise this issue before the juvenile court. Because this issue was raised for the first time on appeal, it is waived. *See N.C. v. Ind. Dep't of Child Servs.*, 56 N.E.3d 65, 68-69 (Ind. Ct. App. 2016), *trans. denied* (issue of whether ADA applied to father in termination context was waived where father failed to raise that issue at termination hearing). Mother also contends that there is insufficient evidence in the record before us to support the juvenile court's

finding that "this is an impossible situation." *Mother's Br.* at 19. Again, we do not address this issue since the juvenile court made no such finding. While Mother has waived essentially all of the issues raised in her brief, because Mother more broadly claims that there was insufficient evidence to support the termination of her parental rights, we address that claim, where appropriate, as part of our analysis regarding Father.

[24] In its May 31, 2016 order terminating Parents' parental rights to Child,[4] the juvenile court entered the following pertinent findings of fact:

> 10. The parents are so limited intellectually that they would have to be supervised 24/7 to be able to "parent the child."
>
> 11. The best way to describe the parents' affection for the child is almost childlike.
>
> 12. The parents cannot stay focused on the child's needs.
>
> 13. The parents do not understand or cannot anticipate basic hazards to the child.
>
> 14. The mother has an impulse control disorder, overreacts with anger and has an IQ of 63.[5]

---

[4] While Mother and Father separately filed their respective notices of appeal, Mother's on June 6, 2016 and Father's on June 15, 2016, the record before us reflects that the juvenile court terminated both Parents' rights by one order, dated May 31, 2016

[5] Minton testified that Mother's IQ was 63. However, Dr. Huett, the psychologist who performed the tests on Mother, testified that Mother's IQ was 53. *Tr.* at 62, 66, 91.

15. The father is easily angered, has anxiety and has an IQ of 59.

16. The parents live with the mother's mother and father.

17. The grandfather is a convicted sex offender.

18. The grandparents' home can be dirty, cluttered and has had bugs and fleas in the past.

19. The mother has not been able to visit the child on occasion due to having head lice.

20. The parents and grandparents argue by yelling, screaming and cursing over the most basic things.

21. Police have had to be called to the residence.

*Appellant's App*. at 14.

[25]   From these facts, the juvenile court terminated Parents' respective parental rights, concluding:

> 4. The Child has been removed from the parent[s] and has been under the supervision of the department for at least fifteen (15) months of the most recent twenty-two (22) months; in cause number 82D04-1409-JC-608, from September 16, 2014 to January 11, 2016
>
> a. There is a reasonable probability that the conditions that resulted in the [Child]'s removal from, and continued placement outside the care and custody of the parents, will not be remedied as the mother and father does [sic] not have a home that is suitable to raise a child and the parents simply are too limited in

their parenting skills and have too many mental health issues to ever provide a safe, stable and loving environment for the child.

b. There is a reasonable probability that the continuation of the parent-child relationship between the mother, father and child poses a threat to the [Child]'s well-being as the parents do not understand the basic needs needed to raise a child until the child becomes of age.

c. Termination of the parent-child relationship between the mother, father and the child is in the best interests of the child as the child needs to live in an environment that is happy, stable and provides normal healthy relationships, so that the child can have the same opportunities as most children receive.

d. The plan of the Department of Child Services for the care and treatment of the child is an adoption, which is reasonable, acceptable and satisfactory.

*Id.* at 14-15. The juvenile court also stated:

[T]his case is truly a sad case. The parents through no fault of their own simply cannot provide for their child. The parents have several very significant issues of their own and have to rely on the mother's family for assistance for their own well-being. Unfortunately, this assistance does not rise to the level necessary to also care for this baby.

*Id.* at 15.

[26] Mother and Father challenge none of the juvenile court's findings. As a result, Parents have waived any argument relating to whether these unchallenged findings are clearly erroneous. *See McMaster v. McMaster*, 681 N.E.2d 744, 747

(Ind. Ct. App. 1997) (unchallenged trial court findings were accepted as true). Parents also do not dispute that DCS presented sufficient evidence to support the elements that: (1) Child was removed from Parents' care and has been under the supervision of DCS for at least fifteen of the most recent twenty-two months under Indiana Code section 31-35-2-4(b)(2)(A)(iii); and (2) there is a satisfactory plan for the care and treatment of Child, i.e., adoption under Indiana Code section 31-35-2-4(b)(2)(D). Instead, Parents argue that DCS failed to prove by clear and convincing evidence that conditions that resulted in the removal of Child will not be remedied, that the continuation of the parent-child relationship with Parents poses a threat to Child, and that termination of Mother's and Father's parental rights is in Child's best interest.

## *Remediation of Conditions*

[27] Parents first argue that DCS did not meet its burden of proving two of the elements under Indiana Code section 31-35-2-4(b)(2)(B). It is well-settled that because Indiana Code section 31-5-2-4(b)(2)(B) is written in the disjunctive, the juvenile court need only find that (1) the conditions resulting in removal from or continued placement outside the parent's home will not be remedied, (2) the continuation of the parent-child relationship poses a threat to the child, *or* (3) the child has been adjudicated CHINS on two separate occasions. *See In re C.C.*, 788 N.E.2d 847, 854 (Ind. Ct. App. 2003), *trans. denied*. Therefore, where the juvenile court determines one of the above-mentioned factors has been proven and there is sufficient evidence in the record supporting the juvenile court's determination, it is not necessary for DCS to prove, or for the juvenile

court to find, any of the other factors listed in Indiana Code section 31-5-2-4(b)(2)(B). *In re S.P.H.*, 806 N.E.2d 874, 882 (Ind. Ct. App. 2004). Accordingly, we focus only on the element of whether the conditions that led to removal and placement outside the Parents' care will not be remedied.

[28] In determining whether the conditions that resulted in Child's removal from or continued placement outside Parents' home will not be remedied, we engage in a two-step analysis. *In re E.M.*, 4 N.E.3d 636, 642-43 (Ind. 2014). First, we identify the conditions that led to removal or continued placement of Child outside the Parents' care; and second, we determine whether there is a reasonable probability that those conditions will not be remedied. *Id.* at 643. "In the second step, the trial court must judge a parent's fitness as of the time of the termination proceeding, taking into consideration evidence of changed conditions," that is, balance a parent's recent improvements against "habitual pattern[s] of conduct to determine whether there is a substantial probability of future neglect or deprivation." *Id.* (citation omitted). "We entrust that delicate balance to the trial court, which has discretion to weigh a parent's prior history more heavily than efforts made only shortly before termination." *Id.* "Requiring trial courts to give due regard to changed conditions does not preclude them from finding that parents' past behavior is the best predictor of their future behavior." *Id.*

[29] The evidence reveals that Child was first removed from Parents' care two days after she was born, when a doctor, noting Parents' below normal intellectual functioning, expressed concern that Parents might be unable to provide proper

care for Child. Child remained in foster care from mid-June to mid-July, when the juvenile court placed Child in Grandparents' home. At that time, Parents, Grandparents, and others lived in the home; however, the juvenile court placed Child in Grandmother's care. Thereafter, DCS learned that Grandfather "is registered as a sexual violent predator," and that he was convicted of four counts of child molesting in February 2000. *DCS Ex.* 3 at 21. Grandfather also had "substantiated DCS sex abuse history as well as DCS history for neglect." *Id*. As part of Grandfather's "probation he cannot be unsupervised around a child, other than his own, under sixteen (16) years old." *Id*. at 21-22. Further, DCS learned that "[t]he custodian, [Grandmother], also has substantiated DCS history for neglect on at least three (3) occasions." *Id*. at 22. In September 2014, Child was removed from Grandparents' home and placed in foster care, where she remained throughout the duration of the case.

[30]     While accepting the above facts, Father contends that Grandparents' home is, in fact, proper housing for Child. Father notes that, notwithstanding Grandfather's history, Grandparents' fifteen-year-old son, Mother's brother, who had been the subject of a CHINS petition and previously been a ward of the State, was recently returned to Grandparents' home during a time when Grandfather lived there. *Father's Br.* at 11. Admitting that Grandfather was deemed to be an inappropriate person with whom to leave Child, Father offers that there were "two other adults and one teenager in the home to help provide supervision of [Child] while in the care of [Parents]." *Id*. at 11-12. Father argues that his testimony at the termination hearing supports his contention that

he was in the process of moving out of the house to live independently. *Id.* at 12 (citing *Tr.* at 150). He also asserts that the services provided to him did not meet the needs of his family, but he was compliant and willing to participate in additional services. From this, Father concludes that the juvenile court erred in finding there is a reasonable probability that the conditions that resulted in Child's removal will not be remedied. We disagree.

[31] The juvenile court knew that Grandparents' fifteen-year-old son had been returned to the house and that other adults lived in Grandparents' home. The juvenile court also heard Father's testimony that he planned to move from the home. In judging the credibility of this evidence, the juvenile court also heard and considered the following evidence: (1) Child is a toddler, *tr.* at 71, and the child who was returned to Grandparents' home was fifteen; (2) Parents are limited intellectually and would have to be supervised "24/7 to be able to 'parent the child,'" *Appellants' App.* at 14; (3) Mother claims she has plans to move out; however, Grandmother, who is the payee of Mother's SSI, did not know of Mother's plans, *tr.* at 159; (4) Mother requires Grandmother's help to bathe, *id.* at 63; (5) Father, when not living in Grandparents' home, has lived with Grandfather, who is Father's SSI payee, *id.* at 150; (6) Grandfather is a convicted sex offender, whose parole terms prevented him from having contact with a child, other than his own, under the age of sixteen, *Appellants' App.* at 22; (7) Grandparents have a history with DCS of neglect of dependents, and one of their children was only recently returned to live in the home, *id.* at 14, *tr.* at 137; (8) Grandparents have a history of different tenants living in the home, *tr.* at

111-12; (9) Grandparents' home is chaotic with constant arguing and fighting, *id*. at 70, 112; (10) the police have been called to the home on numerous occasions, *id*. at 112; (11) the home has had issues with fleas, roaches, and lice, *id*.; (12) Parents do not consistently engage with child; and (13) Parents would need a strong support system to raise Child, *tr*. at 91-92. From this evidence, it was reasonable for the juvenile court to conclude that the conditions that resulted in the removal and continued placement of Child outside the home would not be changed. Having found conditions will not be remedied, we need not reach Parents' claim that the continuation of the parent-child relationship poses a threat to Child. *In re S.P.H.*, 806 N.E.2d at 882.

### Best Interests of Child

[32]     Father asserts that DCS failed to prove by clear and convincing evidence that termination of Parents' parental rights is in Child's best interests. Specifically, he argues that losing the parental bond affects a child for life and puts a child "at risk for further problems later in life such as criminal justice involvement or for running away." *Father's Br*. at 13-14. Father cites to no authority to support these general statements, nor does he explain how the termination of parental rights will specifically affect Child. Therefore, to the extent Father is challenging the sufficiency of this conclusion, we find that failure to support his general statements with cogent argument has resulted in waiver. *A.D.S. v. Ind. Dep't of Child Servs.*, 987 N.E.2d 1150, 1156 n.4 (Ind. Ct. App. 2013), *trans. denied*.

[33] Waiver notwithstanding, we find no error in the juvenile court's determination that termination of Parents' parental rights was in Child's best interests. In determining what is in the best interests of a child, the trial court must look beyond the factors identified by DCS to the totality of the evidence. *A.D.S.*, 987 N.E.2d at 1158. In so doing, the court must subordinate the interests of the parents to those of the child. *Id*. The court need not wait until the child is irreversibly harmed before terminating the parent-child relationship. *Id*. "Moreover, we have previously held that the recommendation by both the case manager and child advocate to terminate parental rights, in addition to evidence that the conditions resulting in removal will not be remedied, is sufficient to show by clear and convincing evidence that termination is in the child's best interests." *Id*. at 1158-59.

[34] Here, DCS proved that there is a reasonable probability that the circumstances leading to Child's removal from or continued placement outside Parents' care will not be remedied. Further, FCM Numa and the CASA supported the termination of Parents' parental rights and the adoption of Child by the foster parents, who had been caring for Child from the time she was three months old. The CASA reported that Child was doing "extremely well" and "progressing very well" in all aspects. *Tr.* at 38. FCM Numa testified that Child has bonded with foster parents. *Id*. at 123. Both the CASA and FCM Numa stated that it was in Child's best interests that Parents' parental rights be terminated and Child be adopted by foster parents. *Id*. at 37-38, 122.

We will reverse a termination of parental rights only upon a showing of "clear error" – that which leaves us with a definite and firm conviction that a mistake has been made. *In re A.N.J.*, 690 N.E.2d 716, 722 (Ind. Ct. App. 1997). Based on the record before us, we cannot say that the juvenile court's termination of Parents' parental rights to Child was clearly erroneous. We, therefore, affirm the juvenile court's judgment.

Affirmed.

Robb, J., and Barnes, J., concur.