# FOR PUBLICATION



**FILED**
Mar 18 2014, 10:04 am

CLERK
of the supreme court,
court of appeals and
tax court

ATTORNEY FOR APPELLANT:

**JOHN ANDREW GOODRIDGE**
Evansville, Indiana

ATTORNEYS FOR APPELLEE:

**GREGORY F. ZOELLER**
Attorney General of Indiana
Indianapolis, Indiana

**ROBERT J. HENKE**
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | | |
|---|---|---|
| IN THE MATTER OF A.G. and A.K. | ) | |
| Children Alleged to be in Need of Services, | ) | |
| | ) | |
| M.K., | ) | |
| | ) | |
| Appellant-Respondent, | ) | |
| | ) | |
| vs. | ) | No. 82A05-1306-JC-297 |
| | ) | |
| INDIANA DEPARTMENT OF CHILD SERVICES, | ) | |
| | ) | |
| Appellee-Petitioner. | ) | |

APPEAL FROM THE VANDERBURGH SUPERIOR COURT
The Honorable Renee Allen Ferguson, Magistrate
Cause Nos. 82D01-1209-JC-345 and 82D01-1302-JC-112

**March 18, 2014**

**OPINION - FOR PUBLICATION**

**NAJAM, Judge**

## STATEMENT OF THE CASE

M.K. ("Mother") appeals the trial court's adjudication of her children A.G. and A.K. as children in need of services ("CHINS"). Mother presents a single issue for our review, namely, whether the trial court erred when it drew a negative inference from Mother's invocation of her Fifth Amendment right against self-incrimination.

We affirm.

## FACTS AND PROCEDURAL HISTORY

Mother gave birth to A.G. on March 14, 2011, and A.K. on February 18, 2013. Just a few months after A.G.'s birth, A.G. began suffering cyanotic episodes, which caused his skin to turn blue, his eyes to roll back in his head, and his body to stiffen. Mother obtained medical treatment for A.G., and he was diagnosed with mild to moderate pulmonary hypertension, a condition common among A.G.'s paternal relatives. Dr. Julio Morera treated A.G.'s cyanotic episodes with medication, oxygen, and the implantation of a pacemaker. Despite the medical interventions, A.G. continued to suffer cyanotic episodes. Accordingly, Dr. Morera referred A.G. for a second opinion with physicians at Riley Children's Hospital, but the physicians there could find no medical explanation for A.G.'s cyanotic episodes.

Dr. Morera then referred A.G. to Kosair Children's Hospital for a third opinion from Dr. Christopher Johnsrude, a board certified pediatric cardiologist specializing in pediatric electrophysiology. Dr. Johnsrude observed A.G. over the course of a one-week stay at Kosair and concluded that: A.G.'s pulmonary hypertension was mild and not severe enough to cause the cyanotic episodes and A.G. did not require a pacemaker.

Accordingly, Dr. Johnsrude "terminated the pacemaker's functioning." Appellant's App. at 230. No one other than Mother had witnessed one of A.G.'s cyanotic episodes. And there was no "pulmonary, neurological, gastrointestinal, or any other internal physiological explanation" for the episodes. Id. Accordingly, Dr. Johnsrude determined that "[w]itnessing or recording the onset of a spell while [A.G.] was under his care at Kosair became the priority for diagnosis." Id.

Dr. Johnsrude kept A.G. under observation and monitored by telemetry and a cardiorespiratory monitor at Kosair. At some point while A.G. was under observation in this manner, Mother requested that the monitors be removed so that she could bathe A.G. Mother was alone, bathing A.G., whose monitors had been removed, when a cyanotic episode occurred. No one else witnessed the onset of that episode besides Mother. Dr. Johnsrude questioned Mother about the episode and suggested that installing video surveillance at Mother's home would be helpful in determining the cause of the cyanotic episodes once A.G. was released from Kosair. Mother did not agree to the video monitoring of A.G., and her response to the suggestion was described by Dr. Johnsrude as "uncomfortable and odd." Id. at 231. Thereafter, Dr. Johnsrude "began to give more weight to the consideration that Mother was the cause of [A.G.]'s cyanotic episodes." Id. Indeed, after Dr. Johnsrude's conversation with Mother about the video monitoring, A.G.'s maternal grandmother, who is a registered nurse, told Dr. Johnsrude that "he should consider Mother's involvement in inducing these episodes." Id. Again, no one but Mother had ever witnessed the onset for one of A.G.'s cyanotic episodes up to that time.

3

Dr. Johnsrude then consulted with other physicians at Kosair and members of the Pediatric Forensic Medicine Team at the University of Louisville School of Medicine regarding A.G.'s case "and the probability that Mother was inducing [A.G.]'s cyanotic episodes." Id. "All experts who Dr. Johnsrude consulted felt the probability of Mother's involvement was strong and he should take further action to safeguard [A.G.] from his Mother." Id. Dr. Johnsrude came to the conclusion that A.G.'s symptoms were

> best explained by external force acting on the child to induce a cyanotic episode. There are a number of ways an external force could be applied to [the] child to induce a cyanotic response, including stimulation of the vagus nerve to elicit a vasovagal response. While Dr. Johnsrude could not speculate exactly how external force was applied to induce the cyanotic episodes, he could estimate that the process would take no more than a matter of seconds.

Id.

Dr. Lisa Pfitzer, a board certified pediatrician specializing in child abuse pediatrics, consulted with Dr. Johnsrude regarding A.G.'s treatment at Kosair. Dr. Pfitzer

> felt it most likely that [A.G.]'s episodes were the result of external airway and/or blood flow obstruction. Dr. Pfitzer opined that the possibility that Mother induced [A.G.]'s symptoms must be seriously considered and stated that the medical team strongly concluded that if [A.G.] was placed in the care of his Mother his death could result.

Id. at 232 (emphasis original). Accordingly, on August 29, 2012, Dr. Pfitzer contacted the Indiana Department of Child Services ("DCS") to express her concerns about A.G.'s safety after his release from Kosair. On September 4, DCS filed a petition alleging that A.G. was a CHINS. DCS placed custody of A.G. with his father and permitted Mother supervised visitations with A.G.

4

Sarah Dotson, a family case manager with DCS, contacted Dr. Susanne Blix, a board certified clinical psychiatrist, and asked that Dr. Blix evaluate Mother for factitious disorder by proxy.[1]  On September 18, Dr. Blix completed a psychiatric evaluation of Mother.  In addition to interviewing Mother, Dr. Blix reviewed A.G.'s medical records, "as well as contacts between DCS and Mother."  Id. at 233.  Dr. Blix concluded "with ninety-nine percent certainty" that Mother suffered from factitious disorder by proxy.  Id.  Dr. Blix opined that A.G.'s episodes "are most consistent with external airway and/or blood flow obstruction."  Id.  Dr. Blix recommended that Mother not be permitted to be alone with A.G. and that visits be supervised by more than one person.  Dr. Blix also warned that Mother should be prohibited from holding or constraining A.G.  Dr. Blix considered the risk of failing to protect A.G. from Mother "life threatening."  Id.  Dr. Blix warned DCS that "any sibling would [also] be at risk of harm when in Mother's custody."  Id.

On September 26, Mother was visiting with A.G. under the supervision of Grant Wargel at a facility called Ireland Homebased Services.  Near the end of the visit, Wargel paused from directly watching Mother to write down some notes.  During the approximately thirty-four seconds that transpired, Mother alerted Wargel that A.G. was having a cyanotic episode.  There was video surveillance of the visit, but Mother was holding A.G. outside the range of the camera for approximately twenty-one of the thirty-four seconds that led to the cyanotic episode.  Wargel believed that Mother knew about

---

[1] As the trial court found, "caretakers affected with Factitious Disorder by Proxy cause harm to their children for attention and many times the affected children are subject to medical conditions which the caretaker will use as a vehicle for their attention seeking behavior."  Appellant's App. at 233.

the camera. Mother was sitting "in the only spot that was not able to be captured by the video." Id. at 236.

Since his removal from Mother's care on August 30, 2012, A.G. has had only one other cyanotic episode, which occurred while in his maternal grandmother's care on March 18, 2013. Dr. Morera examined him at the hospital after the episode and believed that it had been caused by A.G.'s pulmonary hypertension. Despite that diagnosis, Dr. Johnsrude and Dr. Blix continued to believe that Mother had factitious disorder by proxy and had caused A.G.'s other cyanotic episodes. On February 19, 2013, shortly after A.K.'s birth, DCS filed another petition alleging A.K. to be a CHINS, and DCS placed A.K. in foster care.

On April 15 and 24, the trial court conducted a fact-finding hearing and adjudicated the children to be CHINS. The trial court entered findings and the following conclusions:

> 3.    [The children's] physical or mental health is seriously endangered by the inability of the parents to provide the child with necessary supervision pursuant to I.C. [§]31-34-1-1. [A.G.]'s physical and mental condition is seriously impaired due to injury caused by the actions or omissions of the Mother pursuant to I.C. [§] 31-34-1-2.
>
> > a. The weight of the evidence proves by preponderance that Mother is afflicted with Factitious Disorder by Proxy and is responsible for [A.G.]'s life threatening cyanotic episodes. This evidence includes, but is not limited to the following:
> >
> > i. The inability of [A.G.]'s medical care providers to explain child's cyanotic episodes consistent with any medical condition in which there is not external action on the child.
> >
> > ii. Dr. Suzanne Blix, a board certified clinical psychiatrist with experience diagnosing and treating Factitious Disorder by Proxy, examined Mother and the history of [A.G.]'s case

6

and diagnosed Mother with Factitious Disorder by Proxy with a reasonable degree of medical certainty.

iii.  <u>Mother's refusal to testify in the state's case in chief draws a negative inference that Mother was concerned about incriminating herself through her testimony, further indicative of mother's guilt</u>.  The CHINS is [sic] a civil matter.  While a negative inference cannot be drawn in a criminal case for asserting the 5th Amendment privilege [sic].  It is widely established in Indiana case law and throughout the United States as follows:

> While our research has uncovered no recent cases supporting Gash's position (that being penalized for asserting his fifth amendment right is incorrect), we have found a number of recent cases, directly on point, which follow the rule expressed in <u>Morgan</u> (holding that a jury may consider a defendant's refusal to testify in a civil case, <u>Morgan v. Kendall</u>, 24 N.E. 143 (1890)).  Although the refusal to testify in a civil case cannot be used against the one asserting the privilege in a subsequent criminal proceeding, the privilege against self-incrimination does not prohibit the trier of fact in a civil case from drawing adverse inferences from a witness' refusal to testify.

<u>Gash v. Kohm</u>, 476 N.E.2d 910, 913 (Ind. Ct. App. 1985).

> The Court has on several occasions recognized that the Fifth Amendment privilege may not be invoked to resist compliance with a regulatory regime constructed to effect the State's public purposes unrelated to the enforcement of its criminal laws.

<u>Baltimore City DSS v. Bouknight</u>, 493 U.S. 549 (1990).

> Our conclusion is consistent with the prevailing rule that the fifth amendment does not forbid adverse inferences against parties to civil actions when they refuse to testify in response to probative evidence offered against them.

7

Baxter v. Palmigiano, 425 U.S. 308, 318 (1976).

b. Dr. Blix stated through her medical opinion and through testimony that both [A.G.] and [A.K.] would not be safe in their Mother's care and the results of Mother having custody could be life threatening to the children.

c. Mother is the legal custodian of both [A.G.] and [A.K.]

4.    A CHINS adjudication focuses on the condition of the child.  In re N.E., 919 N.E.2d 102, 105 (Ind. 2010).

a. The number of cyanotic episodes experienced by [A.G.] has decreased tremendously since he has been restricted from his Mother's care.  Whereas the child had multiple and frequent cyanotic episodes without medical explanation when with his mother, [A.G.] has only suffered one of these incidents since restriction from Mother, which was explained physiologically by Dr. Morera as occurring due to moderate pulmonary hypertension.

b. The results of the separation test alone are indicative that [A.G.] is not safe in his mother's care.  Due to Mother's diagnosis and concern for her disorder as described by Dr. Blix, [A.K.] is also not safe in his mother's care.

5.    [A.G.] and [A.K.] are in need of care, treatment, or rehabilitation which the child is unlikely to receive without coercive intervention of the Court.

WHEREFORE, the Court finds that the children, [A.G.] and [A.K.], are Children in Need of Services, and shall remain under the supervision, care, and custody of the Indiana Department of Child Services. . . .

Id. at 237-40 (emphasis added).  This appeal ensued.[2]

## DISCUSSION AND DECISION

Mother's sole contention on appeal is that the trial court erred when it drew a negative inference from her invocation of her Fifth Amendment right not to testify.

---

[2] A.G.'s father does not participate in this appeal.  A.K.'s father is unknown.

Mother does not challenge any of the trial court's other findings and conclusions. She maintains that the trial court's error on this issue warrants that the CHINS determinations be vacated.

When a court's order contains specific findings of fact and conclusions thereon, we engage in a two-tiered review. In re T.S., 906 N.E.2d 801, 804 (Ind. 2009). First, we determine whether the evidence supports the findings. Id. Then, we determine whether the findings support the judgment. Id. Findings are clearly erroneous when there are no facts or inferences drawn therefrom that support them. Id. A judgment is clearly erroneous if the findings do not support the trial court's conclusions or the conclusions do not support the resulting judgment. Id. The appellate court should not reweigh the evidence or judge the credibility of witnesses, but should view the evidence and its reasonable inferences most favorably to the judgment.[3] Id.

As the trial court concluded, although the refusal to testify in a civil case cannot be used against the one asserting the privilege in a subsequent criminal proceeding, the privilege against self-incrimination does not prohibit the trier of fact in a civil case from drawing adverse inferences from a witness' refusal to testify. See Gash v. Kohm, 476 N.E.2d 910, 913 (Ind. Ct. App. 1985). Mother acknowledges the rule in Gash, but she urges us to hold that the rule should not apply in CHINS proceedings. She maintains that, while "the privilege against self-incrimination does not prohibit the trier of fact in a civil case from drawing adverse inferences from a witness' refusal to testify," this rule "has never been extended to a CHINS proceeding, where a parent's constitutionally

---

[3] Mother contends that our standard of review is de novo. But she does not cite relevant authority in support of that contention.

protected interest to a relationship with his/her child is implicated." Appellant's Brief at 19. Mother acknowledges that a CHINS proceeding is a civil matter, but she asserts that "more often than not, a parent of a child alleged to be in need of services by the State . . . is also subject to criminal prosecution." Id. And Mother alleges that the DCS and the "local prosecutorial authority . . . have the ability to, and often do, work hand in hand." Id. Thus, Mother contends that the negative inference should not be available in a CHINS case because "the State is a party and has discretion to recommend either criminal prosecution or simply to pursue services on behalf of a minor child." Id.

First, Mother does not support these contentions with citations to the record or relevant authority. These bald assertions, without more, are unpersuasive. Indeed, while Mother alleges that she was "under threat of criminal prosecution" at the time of the fact-finding hearing, she cites nothing in the record to support that statement. Appellant's Brief at 20. Second, Mother argues only that "[t]he State should not possess such a sword in the context of CHINS proceedings affecting a parent's constitutionally protected right to a relationship with a minor child." Id. She does not make cogent argument based on public policy or constitutional law, and we will not make those arguments for her.

In sum, Mother contends that her right to raise her children has a constitutional dimension which distinguishes a CHINS proceeding from other civil proceedings. Thus, she maintains that the rule in Gash should not apply here. But Mother does not support that contention with cogent argument or citations to the record, and the issue is waived. Waiver notwithstanding, Mother does not challenge the remainder of the trial court's findings and conclusions. Thus, even disregarding the trial court's negative inference,

10

the court's findings support the remaining conclusions and the conclusions support the judgment. The trial court's judgment finding the children to be CHINS is not clearly erroneous.

Affirmed.

BAKER, J., and CRONE, J., concur.