# MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



**FILED**

Dec 21 2016, 8:35 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Matthew J. McGovern
Anderson, Indiana

ATTORNEYS FOR APPELLEE

Gregory F. Zoeller
Attorney General of Indiana

Robert J. Henke
Deputy Attorney General

David E. Corey
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

In the Termination of the Parent-Child Relationship of:

A.C. (Minor Child) and

M.K. (Mother),

*Appellant-Respondent,*

v.

The Indiana Department of Child Services,

*Appellee-Petitioner.*

December 21, 2016

Court of Appeals Case No.
82A01-1607-JT-1683

Appeal from the Vanderburgh Superior Court

The Honorable Brett J. Niemeier, Judge

The Honorable Renee Ferguson, Magistrate

Trial Court Cause No.
82D01-1510-JT-1802

**Bailey, Judge.**

# Case Summary

M.K. ("Mother") appeals the termination of her parental rights to A.C. ("Child"), upon the petition of the Vanderburgh County Department of Child Services ("the DCS"). We affirm.

# Issue

Mother presents a single issue for review: Whether the DCS established, by clear and convincing evidence, the requisite statutory elements to support the termination decision.

# Facts and Procedural History

A.C. was born to Mother in February of 2013.[1] He was removed from Mother's care one day later and placed in foster care, due to events surrounding his older sibling, A.G. These events were discussed in *In re A.G.*, 6 N.E.3d 952, 953-55 (Ind. Ct. App. 2014):

> Just a few months after A.G.'s birth, A.G. began suffering cyanotic episodes, which caused his skin to turn blue, his eyes to roll back in his head, and his body to stiffen. Mother obtained medical treatment for A.G., and he was diagnosed with mild to

---

[1] Father agreed to the termination of his parental rights and is not an active party to this appeal.

moderate pulmonary hypertension, a condition common among A.G.'s paternal relatives. Dr. Julio Morera treated A.G.'s cyanotic episodes with medication, oxygen, and the implantation of a pacemaker. Despite the medical intervention, A.G. continued to suffer cyanotic episodes. Accordingly, Dr. Morera referred A.G. for a second opinion with physicians at Riley Children's Hospital, but the physicians there could find no medical explanation for A.G.'s cyanotic episodes.

Dr. Morera then referred A.G. to Kosair Children's Hospital for a third opinion from Dr. Christopher Johnsrude, a board certified pediatric cardiologist specializing in pediatric electrophysiology. Dr. Johnsrude observed A.G. over the course of a one-week stay at Kosair and concluded that: A.G.'s pulmonary hypertension was mild and not severe enough to cause the cyanotic episodes and A.G. did not require a pacemaker. … No one other than Mother had witnessed one of A.G.'s cyanotic episodes. …

Dr. Johnsrude kept A.G. under observation and monitored by telemetry and a cardiorespiratory monitor at Kosair. At some point while A.G. was under observation in this manner, Mother requested that the monitors be removed so that she could bathe A.G. Mother was alone, bathing A.G., whose monitors had been removed, when a cyanotic episode occurred. No one else witnessed the onset of that episode besides Mother. Dr. Johnsrude questioned Mother about the episode and suggested that installing video surveillance at Mother's home would be helpful in determining the cause of the cyanotic episodes once A.G. was released from Kosair. Mother did not agree to the video monitoring of A.G., and her response to the suggestion was described by Dr. Johnsrude as "uncomfortable and odd." …

Dr. Johnsrude then consulted with other physicians at Kosair and members of the Pediatric Forensic Medicine Team at the University of Louisville School of Medicine regarding A.G.'s case "and the probability that Mother was inducing [A.G.]'s

cyanotic episodes." … Dr. Lisa Pfitzer, a board certified pediatrician specializing in child abuse pediatrics, consulted with Dr. Johnsrude regarding A.G.'s treatment at Kosair. …

[O]n August 29, 2012, Dr. Pfitzer contacted the Indiana Department of Child Services ("DCS"). … Sarah Dotson, a family case manager with DCS, contacted Dr. Susanne Blix, a board certified clinical psychiatrist, and asked that Dr. Blix evaluate Mother for factitious disorder by proxy.[2] … Dr. Blix concluded "with ninety-nine percent certainty" that Mother suffered from factitious disorder by proxy. … Dr. Blix considered the risk of failing to protect A.G. from Mother "life threatening." Dr. Blix warned DCS that "any sibling would [also] be at risk of harm when in Mother's custody."

(Record Citations Omitted.)

[4] On the date of A.C.'s removal, the DCS filed a petition alleging that A.C. was a Child in Need of Services ("CHINS"). The DCS alleged that A.C. was in danger and that Mother had been diagnosed as suffering from factitious disorder by proxy, formerly known as Munchausen's disorder. The trial court, juvenile division, held a fact-finding hearing on April 16, 17, 24, and 29, 2013. A.C. was found to be a CHINS and remained in foster care. In a dispositional order of July 23, 2013, Mother was ordered to participate in a treatment

---

[2] As the trial court found, "caretakers affected with Factitious Disorder by Proxy cause harm to their children for attention and many times the affected children are subject to medical conditions which the caretaker will use as a vehicle for their attention seeking behavior." Appellant's App. at 233.

program. Mother was to have supervised visitation subject to recommendation by a mental health provider.

[5] Mother was compliant with the DCS case plan, obtained individual mental health therapy, and commenced regular monitored visitation with A.C. According to a DCS progress report of January 10, 2014, Mother "continue[d] to show progress" and the anticipated permanency plan was reunification. (DCS Exh. 15(kk)). On February 20, 2014, the trial court approved a permanency plan of reunification.

[6] One month later, on March 21, 2014, the State of Indiana charged Mother with three Class B felonies related to her conduct with A.G. On July 17, 2015, Mother was convicted of Neglect of a Dependent. She was sentenced to ten years imprisonment, with one year suspended.

[7] On October 9, 2015, the DCS petitioned to terminate Mother's parental rights as to A.C. A hearing was conducted on May 26, 2016. On June 28, 2016, the trial court entered its findings of fact, conclusions, and order terminating Mother's parental rights. This appeal ensued.

# Discussion and Decision

## Standard of Review – Sufficiency of the Evidence

[8] When we review whether the termination of parental rights is appropriate, we will not reweigh the evidence or judge witness credibility. *In re V.A.*, 51 N.E.3d 1140, 1143 (Ind. 2016). We will consider only the evidence and reasonable

inferences that are most favorable to the judgment. *Id.* In so doing, we give "due regard" to the trial court's unique opportunity to judge the credibility of the witnesses. *In re I.A.*, 934 N.E.2d 1127, 1132 (Ind. 2010). "We will set aside the trial court's judgment only if it is clearly erroneous." *Bester v. Lake Cty. Office of Family & Children*, 839 N.E.2d 143, 147 (Ind. 2005). In order to determine whether a judgment terminating parental rights is clearly erroneous, we review the trial court's judgment to determine whether the evidence clearly and convincingly supports the findings and the findings clearly and convincingly support the judgment. *I.A.*, 934 N.E.2d at 1132.

## Requirements for Involuntary Termination of Parental Rights

[9] "The Fourteenth Amendment to the United States Constitution protects the traditional right of parents to establish a home and raise their children." *In re Adoption of O.R.*, 16 N.E.3d 965, 972 (Ind. 2014). Although parental rights are of a constitutional dimension, the law provides for the termination of those rights when the parents are unable or unwilling to meet their parental responsibilities. *Bester*, 839 N.E.2d at 147. The State is required to prove that termination is appropriate by a showing of clear and convincing evidence, a higher burden than establishing a mere preponderance. *In re V.A.*, 51 N.E.3d at 1144.

[10] Indiana Code section 31-35-2-4(b)(2) sets out the elements that the DCS must allege and prove by clear and convincing evidence in order to terminate a parent-child relationship:

(A) that one (1) of the following is true:

(i)     The child has been removed from the parent for at least six (6) months under a dispositional decree.

(ii)    A court has entered a finding under IC 31-34-21-5.6 that reasonable efforts for family preservation or reunification are not required, including a description of the court's finding, the date of the finding, and the manner in which the finding was made.

(iii)   The child has been removed from the parent and has been under the supervision of a local office or probation department for at least fifteen (15) months of the most recent twenty-two (22) months, beginning with the date the child is removed from the home as a result of the child being alleged to be a child in need of services or a delinquent child;

(B) that one (1) of the following is true:

(i)     There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.

(ii)    There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.

(iii)   The child has, on two (2) separate occasions, been adjudicated a child in need of services;

(C) that termination is in the best interests of the child; and

(D) that there is a satisfactory plan for the care and treatment of the child.

Indiana Code Section 31-35-2-4(b)(2)(B) is written in the disjunctive, and therefore the court need only to find that one of the three requirements of

subsection (b)(2)(B) had been established by clear and convincing evidence. *See In re L.S.*, 717 N.E.2d at 209.

## Analysis

[12] The trial court's findings of fact address Mother's mental health diagnosis, participation in dialectical behavioral therapy, criminal proceedings, prospective release date, inability to obtain parenting classes during incarceration, and history of visitation with A.C. The findings also address the CHINS history, and A.C.'s need for stability and reported bonding with his foster mother, who wishes to adopt him. Upon these findings, the trial court concluded that A.C. had been removed for the requisite time, the continuation of the parent-child relationship posed a threat to A.C., termination was in A.C.'s best interests, and there was a satisfactory plan for A.C. Mother focuses upon whether there is clear and convincing evidence of a reasonable probability that continuation of the parent-child relationship poses a threat to A.C.'s well-being.

[13] At the termination hearing, Mother testified that her release date was in June of 2019 and she explained her plan for A.C.'s care during her incarceration. That is, Mother desired that her sister be allowed to adopt A.C. and Mother had signed a consent to that effect. On appeal, she notes that four of the findings of fact concern her incarceration, and she contends that the trial court's decision rested primarily upon that status, something insufficient to support termination.

[14] Mother argues that the termination order must be reversed in light of *K.E. v. Indiana Dep't of Child Servs.*, 39 N.E.3d 641 (Ind. 2015), as she is likewise a parent incarcerated for a crime committed before the child's birth. She directs our attention to our Supreme Court's language: "incarceration is an insufficient basis for terminating parental rights." *Id.* at 643. The *K.E.* Court also observed that it had "not established a bright-line rule for when release must occur to maintain parental rights" and "the potential release date is only one consideration of many that may be relevant in a given case." *Id.* at 648.

[15] K.E. was in the care of his paternal aunt, H.D. In prison, the father had completed twelve (mostly voluntary) self-improvement programs; there was evidence that he had a place to live and prospective employment upon his release. *See id.* at 646-47. Father had continued to develop a bond with K.E. through visitation and nightly telephone calls. *Id.* at 651. H.D. had testified that she hoped Father could take over as caregiver, and she did not "insist upon immediate adoption." *Id.* Because "there was nothing more Father could have done," the termination decision rested solely upon his incarceration. *Id.* at 645. On transfer, the Court found a lack of clear and convincing evidence that the conditions leading to removal could not be remedied or that Father posed a threat to K.E.'s well-being. *Id.* at 644.

[16] Here, the circumstances do not mirror those of *K.E.* There is similarity in parental circumstances; their crimes pre-dated the births of their children and they each pursued self-improvement paths. However, the children were not similarly situated. In *K.E.*, there was evidence of continued parent-child

bonding. The father was able to have in-person visits and maintain nightly contact with his child because of placement in the paternal aunt's home. Also, the caregiving aunt testified to her desire that the parent-child bond be maintained. Significantly, H.D., the CASA, and the DCS case manager had all acknowledged it was unlikely that K.E. would be harmed by delaying termination. *Id.* at 650.

[17] Here, by contrast, Mother had been unable or unwilling to maintain contact with A.C. after her incarceration. There was testimony that A.C. would likely be traumatized by a separation from his foster mother, with whom he had lived for the three years since his birth. There was no evidence that Mother had prospective employment or was likely to provide a home for A.C. upon her release, when A.C. would be at least six years old. Indeed, Mother testified that she planned to have her sister adopt A.C. In effect, Mother's position is that she was entitled to direct A.C.'s adoptive placement. *K.E.* does not support this proposition.

[18] Mother also observes that three of the trial court's findings of fact concern A.C.'s bonding to his foster mother and his need for stability. Mother acknowledges evidence of a strong bond between A.C. and his foster mother, but reminds us that her parental rights are of a constitutional dimension: "absent a finding that the Mother poses a threat to the child or that the reasons for removal will likely not be remedied, it is hard to imagine how a child's bond with a foster mother should override the fundamental constitutional right of a biological mother to her child." Appellant's Br. at 36.

[19]     Mother then argues that the trial court did not properly assess whether she posed a threat to A.C. because the trial court focused upon past conduct and a mental health diagnosis as opposed to a continuing threat. According to Mother, "DCS did not provide a scintilla of evidence that Mother's danger to A.C. continued until the termination hearing." Appellant's Br. at 41.

[20]     Our reading of the trial court's findings of fact does not confirm the contention that the trial court focused only upon historical conduct. Rather, the findings addressed the historical events of Mother's criminal conduct and mental health diagnosis together with their impact upon her circumstances as of the time of the hearing. It is commendable that Mother cooperated with DCS services, including individual therapy, and that she incurred no criminal charges based on post-birth conduct. Nonetheless, the egregiousness of the past conduct, felony neglect of A.C.'s older sibling, placed Mother in DOC custody for a significant term of years.

[21]     The trial court found that Mother had not completed dialectical behavioral therapy and was unable to do so during her incarceration.[3] Moreover, the trial court found that Mother lacked a plan for providing for A.C. upon her release. This is consistent with Mother's testimony that she desired an intra-family adoption.

---

[3] To the extent that Mother suggests the therapy is unnecessary because her therapist did not believe that Mother suffered from Factitious Disorder by Proxy, she presents an improper request to reweigh the evidence. *In re V.A.*, 51 N.E.3d at 1143.

Parental rights are not to be terminated merely because there may be a better home available for the child. *I.E.*, 39 N.E.3d at 650. Thus, A.C.'s bonding with his foster mother is not dispositive. However, by presenting evidence of Mother's history, interrupted therapy, and limited future prospects, the DCS established that Mother was unable or unwilling to provide for A.C.'s care. The trial court's termination decision is supported by clear and convincing evidence that continuation of the parent-child relationship would pose a threat to A.C.

# Conclusion

The DCS established by clear and convincing evidence the requisite elements to support the termination of parental rights.

Affirmed.

Najam, J., and May, J., concur.