# MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Mar 30 2017, 7:13 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Danielle L. Gregory
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Robert J. Henke
Marjorie Newell
Deputy Attorneys General
Indianapolis, Indiana

## IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| In Re The Matter of S.G. (Minor Child);<br><br>P.G. (Mother),<br>*Appellant-Respondent,*<br><br>v.<br><br>The Indiana Department of Child Services,<br>*Appellee-Petitioner.* | March 30, 2017<br><br>Court of Appeals Case No.<br>49A05-1610-JC-2351<br><br>Appeal from the Marion Superior Court<br><br>The Honorable Marilyn Moores, Judge<br><br>The Honorable Rosanne Ang, Magistrate<br><br>Trial Court Cause No.<br>49D09-1601-JC-211 |

**Pyle, Judge.**

# Statement of the Case

P.G. ("Mother") appeals the trial court's order adjudicating S.G. ("S.G.") to be a Child in Need of Services ("CHINS"). Mother argues that the Department of Child Services ("DCS") failed to prove by a preponderance of the evidence that: (1) S.G.'s physical or mental condition was seriously impaired or seriously endangered as a result of Mother's inability, refusal, or neglect to supply S.G. with necessary food, clothing, shelter, medical care, education, or supervision; and (2) S.G. needs care, treatment, or rehabilitation that she was unlikely to be provided without the coercive intervention of the court. Finding sufficient evidence to support the adjudication, we affirm the trial court's judgment.

We affirm.

# Issue

Whether there is sufficient evidence to support the CHINS adjudication.

# Facts

In 2015, Mother lived with her paternal grandparents and her father at the grandparents' home. After running away, she was adjudicated to be a CHINS and court ordered to participate in a residential treatment program at Valle Vista Health System. In January 2016, while still in treatment, sixteen-year-old Mother gave birth to S.G. Mother was unable to take S.G. with her to Valle Vista, and her grandparents were unable to take placement of S.G. because of

their history with DCS.  Because no other family members were available to care for S.G., she was placed in foster care.

[4]     Five days after S.G.'s birth, DCS filed a petition alleging that she was a CHINS.  Specifically, the petition alleged that Mother lacked both the ability to provide S.G. with a safe, stable, and appropriate living environment and the financial means and parenting skills to provide S.G. with basic care and necessities.  The petition further alleged that Mother was a patient at Valle Vista and had not successfully demonstrated an alternative plan for S.G.'s care.  Therefore, according to the petition, the coercive intervention of the Court was necessary to ensure S.G.'s safety and well-being.

[5]     Evidence presented at the July 2016 fact-finding hearing revealed that Mother had initially participated in supervised visitation with S.G. at Valle Vista.  By the time of the hearing, however, Mother had been discharged from Valle Vista and was living at her grandparents' house with her grandparents, father, and several other family members.  Mother had never been alone with S.G. and had been participating in supervised parenting time with S.G. four days a week at her grandparents' home.  At the time of the hearing, Mother was visiting with S.G. two hours three days a week and six to eight hours one day a week.  Mother admitted that she had begun ending the longer visits early because she had "gotten tired and then like the whole situation exhausted – was exhausting . . . ." (Tr. 16).

[6]     Visitation facilitator Whitney Gaines ("Gaines") expressed her concern that Mother had begun ending the visits early. For example, during one visit, Mother said she was tired and wanted to end the long visit four hours early so she could get some sleep. However, toward the end of the visit, Mother "went and got dressed and changed her clothes and some friends had c[o]me by so when [we were] leaving[,] she took baby to the vehicle and then she went outside to meet her friends." (Tr. 46). Gaines also explained that Mother needed a child care plan since she would be returning to school. Gaines was concerned that grandparents had significant health issues and would not be able to care for the child. Grandmother was on oxygen and there were several tanks in the house; yet, other members of the household continued to smoke. Father was on house arrest and had a suspended license but continued to drive and was the primary provider of transportation in the household. Father's girlfriend had her own open DCS case, and others who lived in the house had not yet completed background checks. Other safety concerns included the recent infestation of bedbugs in the grandparents' home and the lack of safety items, such as safety gates, that had been recommended in the home. Gaines also wanted to be sure that Mother was "able to adjust to school in addition to having a child and adjust to all of the other services before placing the child back in the home." (Tr. 53).

[7]     DCS family case manager Kevisha Brookshire ("Brookshire") also testified that she was concerned about Mother becoming distracted during the longer visits and ending them early. Specifically, Brookshire explained that "if [Mother is]

shortening visits how do I know [she's] ready to be a full-time parent . . . ." (Tr. 33). Brookshire also testified that Mother needs guidance on parenting skills, which is a safety concern. When asked why she felt that S.G. should be adjudicated to be a CHINS, Brookshire explained as follows:

> [Mother] would benefit from the help of DCS providing her with ongoing services. I mean I, I believe [Mother] could be a great mother, but I think she needs a little bit more time to learn how to adjust to being a teen mom cause it's definitely not easy and she's still sixteen and a teenager and she's still sixteen and want[s] to do teenager things. So, [Mother] needs a little more time to adjust to learning on how to be a teen mom and balancing out being a teenager on top of balancing out how to be in school and I don't know if [Mother] will be able to do that on her own.

(Tr. 36).

[8] Following the hearing, the trial court issued an order, which concluded that S.G. was a CHINS and provided in relevant part as follows:

> 14. [S.G.]'s physical or mental condition is seriously impaired or seriously endangered as a result of the inability, refusal or neglect of the child's parent, guardian, or custodian to supply the child with necessary food, clothing, shelter, medical care, education, or supervision. [Mother] is a sixteen-year-old mother who has a history of running away from home and was recently discharged from a residential facility. [Mother] has not been able to sustain more than a few hours of parenting time with her child at a time and is not ready to parent the child full-time.

> 15. [S.G] needs care, treatment, or rehabilitation that she is not receiving and is unlikely to be provided or accepted without the

coercive intervention of the court. This Court is not required to wait until a child is harmed before intervening. The condition of this seven-month-old-child is that she requires a consistent caregiver who is able to provide for all of her needs. Until [Mother] acquires the skills to care for herself and her child, the intervention of this Court is needed to ensure that [S.G.] obtains the care she requires.

(App. 104). Mother now appeals.

# Decision

[9] Mother argues that there is insufficient evidence to support the CHINS adjudication. When determining whether there is sufficient evidence to support a CHINS determination, we consider only the evidence most favorable to the judgment and the reasonable inferences to be drawn therefrom. *In re S.D.*, 2 N.E.3d 1283, 1287 (Ind. 2014). This Court will not reweigh the evidence or reassess the credibility of the witnesses. *Id.* at 1286. Where, as here, a juvenile court's order contains specific findings of fact and conclusions of law, we engage in a two-tiered review. *In re A.G.*, 6 N.E.3d 952, 957 (Ind. Ct. App. 2014). First, we determine whether the evidence supports the findings, and then, we determine whether the findings support the judgment. *Id.* Findings are clearly erroneous when there are no facts or inferences to be drawn therefrom that support them. *Id.* A judgment is clearly erroneous if the findings do not support the juvenile court's conclusions or the conclusions do not support the resulting judgment. *Id.*

[10] A mother's constitutionally protected right to raise her child is not without limitation. *E.P. v. Marion Cty. Office of Family and Children*, 653 N.E.2d 1026, 1031-32 (Ind. Ct. App. 1995). This is because the State has a compelling interest in protecting the welfare of the child by intervening in the parent-child relationship when parental neglect, abuse, or abandonment is at issue. *Id.* at 1032.

[11] A CHINS proceeding is a civil action. *In re N.E.*, 919 N.E.2d 102, 105 (Ind. 2010). Therefore, DCS must prove by a preponderance of the evidence that the child is a CHINS as defined by the juvenile code. *Id.* INDIANA CODE § 31-34-1-1 provides that a child is a CHINS if, before the child becomes eighteen (18) years of age:

> (1) the child's physical or mental condition is seriously impaired or seriously endangered as a result of the inability, refusal, or neglect of the child's parent, guardian, or custodian to supply the child with the necessary food, clothing, shelter, medical care, education, or supervision; and
>
> (2) the child needs care, treatment, or rehabilitation that:
>
>> (A) the child is not receiving; and
>>
>> (B) is unlikely to be provided or accepted without the coercive intervention of the court.

[12] A CHINS designation focuses on the child's condition rather than the parent's culpability. *In re N.E.*, 919 N.E.2d at 105. The purpose of a CHINS adjudication is to provide proper services for the benefit of the child, not to punish the parent. *Id.* at 106.

[13]     Here, Mother specifically contends that DCS failed to prove by a preponderance of the evidence that: (1) S.G.'s physical or mental condition was seriously impaired or seriously endangered as a result of [Mother's] inability, refusal, or neglect to supply S.G. with necessary food, clothing, shelter, medical care, education, or supervision; and (2) S.G. needs care, treatment, or rehabilitation that she was unlikely to receive without the coercive intervention of the court. We address each of her contentions in turn.

[14]     First, our review of the evidence reveals that after sixteen-year-old Mother, who had previously been adjudicated to be a CHINS, was discharged from the residential treatment facility that she was court ordered to attend, she began ending her visits with her daughter early. She had never been alone with her daughter and had not spent more than a few hours at a time parenting her child. Mother lived with her paternal grandparents, her father, and other relatives, many of whom had not completed background checks. Both grandparents had health issues. Grandmother was on oxygen; yet, others in the household smoked in the house. Father was on house arrest, and even though his license had been suspended, he was the primary driver in the household. His girlfriend had an open case with DCS. In addition, grandparents' home had recently become infested with bed bugs, and no one had provided safety items, such as safety gates, that had been recommended for the home. This evidence supports the trial court's conclusion that S.G.'s physical or mental condition was seriously impaired or seriously endangered as a result of Mother's inability to supply S.G. with the necessary supervision.

[15] Our review of the evidence further reveals that, at the time of the fact-finding hearing, Mother lacked the skills necessary to care for her infant daughter. Mother had never been alone with her daughter. In addition, she was faced with health and safety concerns in her grandparents' home, such as household members who had not had background checks and who were smoking in the house around oxygen tanks and an infestation of bed bugs. Also, recommended safety items for S.G., such as safety gates, had not been purchased. This evidence supports the trial court's conclusion that sixteen-year-old Mother was simply unable to remedy these situations and provide S.G. with a safe environment without the coercive intervention of the court. We therefore find sufficient evidence to support S.G.'s adjudication as a CHINS.

[16] Affirmed.

May, J. and Brown, J., concur.