# MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Sep 17 2018, 10:37 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT L.I., MOTHER

R. Patrick Magrath
Alcorn Sage Schwartz & Magrath, LLP
Madison, Indiana

ATTORNEY FOR D.I., FATHER[1]

Laura M. Sorge-Fattouch
Lawrenceburg, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Robert J. Henke
Abigail R. Recker
Deputy Attorneys General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| In the Matter of J.I., Child in Need of Services, <br><br> L.I., Mother, <br><br> *Appellant-Respondent,* <br><br> v. <br><br> Indiana Department of Child Services, | September 17, 2018 <br><br> Court of Appeals Case No. 18A-JC-617 <br><br> Appeal from the Dearborn Circuit Court <br><br> The Honorable James D. Humphrey, Judge <br><br> Trial Court Cause No. 15C01-1711-JC-150 |

[1] Laura M. Sorge-Fattouch filed an appearance on behalf of D.I., Father, and Father filed a notice of appeal and appendices, but did not thereafter file an appellant's brief. Given Father's initial involvement in the appeal, we have included Father's counsel in the caption.



*Appellee-Petitioner.*

**Kirsch, Judge.**

[1] L.I. ("Mother") appeals the juvenile court's order adjudicating J.I. ("Child") as a child in need of services ("CHINS"), claiming that the Indiana Department of Child Services ("DCS") did not present sufficient evidence to support the CHINS determination.

[2] We affirm.

## Facts and Procedural History

[3] Mother and D.I. ("Father") are the parents of Child, born in August 2003. In November 2017, Mother, Father, and Child were living together in a home in Aurora, Indiana. On October 2, 2017, DCS received a report of poor home conditions, more specifically, that the residence was unsanitary and "unlivable," there were mice, rats, and snakes in the home that were not pets, garbage "overtakes the kitchen," and "there wasn't a sufficient bed" for Child.

*Tr.* at 7; *Appellant's Confid. App. Vol. 2* at 23.[2] DCS family case manager, June Phillips ("FCM Phillips") conducted an assessment and investigated the home.

[4] Mother and Father (together, "Parents") acknowledged to FCM Phillips that there were rats and mice in the home and that there was a snake that lived in their shed that entered the home through a hole in one of the doors. *Tr.* at 10-11; *Appellant's Confid. App. Vol. 2* at 25. FCM Phillips noticed that the home contained "substantial clutter that could become hazardous." *Appellant's Confid. App. Vol. 2* at 24. During the investigation, Mother told FCM Phillips that the home's pump for the well was broken and that they were "using the [family's] water down the hill." *Id.* Child told FCM Phillips that there was domestic violence between her parents on a monthly basis. *Id.* at 24, 26.

[5] On October 8, 2017, DCS received another report, which concerned a domestic incident involving Mother, Father, and Child, and law enforcement was involved. Child reported to law enforcement that Father "had a gun and made [Mother] go with him." *Id.* at 25. On or around this time, Child went to the home of a family friend in Aurora, where she ultimately stayed during the CHINS proceedings. FCM Phillips tried to reach Parents on the night that DCS received the report, leaving voicemails and sending text messages, but FCM Phillips did not receive a response. *Tr.* at 8. FCM Phillips left more

---

[2] Our reference to *Appellant's Confid. App. Vol. 2* refers to Mother's appendix; although Father filed appendices, he did not file a brief, he is not a party to this appeal, and we do not refer to or rely on his appendix.

voicemails and texts for Parents the next day, but again received no reply. *Id.* at 8, 15. On or around the following day, FCM Phillips reached Parents, but they indicated that they were not willing to meet or talk to DCS. *Id.* at 8.

[6] On November 6, 2017, DCS received a report of allegations of physical abuse to Child. FCM Phillips went to where Child was located, and FCM Phillips observed marks on Child's face, finger, upper thigh, and hip. *Tr.* at 12-13; *Appellant's Confid. App. Vol. 2* at 21. Child also showed the marks to law enforcement. *Tr.* at 13. Child initially told FCM Phillips that "her dad only yells at her" and "never hits her[,]" but later explained that her Father had become upset about his car breaking down "and took it out on [Child] and [Mother]." *Id.* at 12; *Appellant's Confid. App. Vol. 2* at 24-25. Child stated that Father pulled her by the hair and hit her in the face and legs. *Appellant's Confid. App. Vol. 2* at 24, 31. DCS contacted Riley Hospital's child abuse team ("Riley") by phone and sent pictures of the marks on Child. *Id.* at 24; *Tr.* at 12-13. The photos were reviewed by a Riley doctor, who, according to FCM Phillips, found, "Impression is indeterminate, but suspicious for inflicted injury based on history." *Appellant's Confid. App. Vol. 2* at 24; *Tr.* at 14. Child was scheduled for an interview at the Child Advocacy Center on November 9, 2017.

[7] A couple of days after the report of physical abuse, on November 9, 2017, FCM Phillips and another case manager, Rachel Leonard ("FCM Leonard"), were waiting near but off Parents' property "to meet with the family to discuss the allegations so we could make a plan" and "get [Child] back into the home." *Tr.* at 9. Parents exited the home and walked down a hill toward where the FCMs

were waiting, and, as they approached, Parents were "screaming things," at them. *Id*. Parents got into a truck, shouted that they were not willing to speak to DCS, and at some point "drove aggressively toward" the FCMs. *Id.*

[8] On November 9, 2017, DCS filed a request asking for emergency custody of Child, reporting that Child had made claims of physical abuse by Father, Parents threatened DCS case managers with their vehicle and refused to meet with DCS, and that immediate removal was necessary to protect Child. *Appellant's App. Vol. 2* at 11-12. The same day, DCS also requested authorization to file a CHINS petition. The juvenile court granted the requests, and on November 9, 2017, DCS filed the CHINS petition. *Id*. at 18-20.

[9] The CHINS petition alleged the following facts: (1) Child had made claims against her Father of physical abuse, with injuries reported; (2) Mother and Father refused to meet with several DCS case managers, including a DCS FCM supervisor; (3) Mother and Father threatened two case managers with their vehicles and directed expletive language towards the case managers; (4) there was a criminal investigation pending; and (5) Child "has been removed from [Parents] with the assistance of law enforcement." *Id.* at 19. DCS asserted that Child was in need of services pursuant to: (1) Indiana Code section 31-34-1-1, as Child's physical or mental condition was seriously impaired or seriously endangered as a result of the inability, refusal, or neglect of the Parents to supply Child with necessary food, clothing, shelter, medical care, education, or supervision; and (2) Indiana Code section 31-34-1-2, in that Child's physical or mental health was seriously endangered due to injury by the act or omission of

Parents. *Id*. at 18. The petition asserted that Child needed care, treatment, or rehabilitation that she was not receiving and that it was unlikely to be provided or accepted without the coercive intervention of the court. *Id*.

[10] On November 16, 2017, the juvenile court held an initial/detention hearing, appointing counsel to represent Mother and Father and continuing the Child's detention outside the home. *Id*. at 42-43. On December 27, 2017, the trial court held a fact-finding hearing. At the time of the fact-finding hearing, both Mother and Father were incarcerated at the Dearborn County Law Enforcement Center; Father had been arrested on charges stemming from the physical abuse allegations, and Mother's arrest stemmed from unrelated charges. *Tr*. at 9-10; *Appellant's Confid. App. Vol. 2* at 46.

[11] At the fact-finding hearing, FCM Phillips testified for DCS. She testified to her investigation of the home after receiving the initial report of the dirty, unlivable conditions, stating that Parents admitted to mice, rats, and a snake in the residence. She acknowledged that she did not observe the mice, rats, or snake, but described that the residence was "very cluttered" and "it was very hard to see if there were any animals living in the home." *Tr*. at 11. As to the investigation of the report of physical abuse, FCM Phillips testified that Child "went to a friend's home so she could call for help" and that "neither [P]arent tried to find [Child] that evening or would make contact with us so we could let them know where she was to get her help." *Id*. at 15. FCM Phillips said that Parents did not respond to Child's attempts to reach them that night or the next day, but when she did reach them, Parents told her that they "were turning their

phones back into Wal-Mart because they weren't getting service and they didn't think they'd be home that night." *Id*. at 8. Once DCS succeeded in reaching Parents, they indicated they were unwilling to meet with DCS.

[12] FCM Phillips described the day when she and FCM Leonard were near Parents' property waiting to speak with them, and Parents came toward them in a hostile manner. She described, "Once they got near us they shouted expletives and that they weren't going to talk to us and we needed their attorney present before they'd even talk to us." *Id*. at 9. Parents drove aggressively toward the FCMs as well. FCM Phillips confirmed that criminal charges against Father resulted from the allegations of physical abuse "and the surrounding circumstances which relate to this case being opened." *Id*. at 9-10.

[13] The juvenile court asked FCM Phillips for additional information about the incident when Parents "came down the hill" and were yelling at FCM Phillips and FCM Leonard. FCM Phillips testified, "They said that they weren't going to f*cking talk to us. And they wanted us off their f*cking property." *Id*. at 17. FCM Phillips said that, as she and FCM Leonard were "trying to leave" and were driving down the road in the same direction that Parents had gone, Parents "put their car in reverse . . . and pulled quickly into a driveway and turned around" such that Parents' vehicle was "coming toward us." *Id*. at 17-18. FCM Phillips then "contacted the Dearborn County Sheriff's Department to let them know the actions that had taken place[.]" *Id*.

On cross-examination by Mother's counsel, FCM Phillips acknowledged that she had observed mouse traps in the residence and that the traps suggested that Parents were "trying to correct that issue." *Id*. at 15-16. She also acknowledged that there were no allegations of physical abuse with regard to Mother. *Id*. at 16. FCM Phillips agreed that Child was currently safe and staying with Parents' family friend "until Parents are released from incarceration." *Id*. The juvenile court inquired whether DCS made that placement, and FCM Phillips responded that "It was made by the family." *Id*. She explained, "One of the evenings when I tried to contact them and they couldn't meet with us, they said that [Child] was staying with this family friend and it was fine for her to stay there. So that's where she was already staying when we asked for a detention." *Id*. at 16-17. FCM Phillips confirmed that, following detention, DCS approved of placement of Child at that residence. *Id*. at 17.

Following the presentation of the evidence the juvenile court took the matter under advisement and directed the parties to submit proposed orders. On December 28, 2017, the juvenile court issued an order adjudicating Child a CHINS pursuant to Indiana Code section 34-31-1-1. *Appellant's Confid. App. Vol. 2* at 45-46. In support, the juvenile court found:

> 1. The Department of Child Services received allegations alleging unsanitary home conditions, specifically that the house has snakes and mice in it, as well as physical abuse allegations.

2.  The [C]hild's Parents [] admitted to the case manager that there are mice in the home, and the case worker noticed mice traps all around the home.

3.  The [P]arents refused to meet with two DCS case managers, June Phillips and Rachel Leonard.

4.  Once the case managers met with the family, both [P]arents threatened them with their vehicle and directed expletive language towards the case managers, stating that they "would not f*cking talk to you" and to get "the f*ck of[f] his property."

5.  As a result of [F]ather's behavior and the allegations of physical abuse, [F]ather was arrested and is currently incarcerated.

6.  Mother is currently incarcerated on an unrelated charge.

7.  The [P]arents' current incarceration shows that they are unable to take care, custody, or control of the [C]hild, and their threatening behavior proves that the coercive intervention of the court is necessary to protect the [C]hild.

*Id.*

[16]     On January 22, 2018, the juvenile court held a dispositional hearing. FCM Leonard testified that Parents had been incarcerated during the time that she had been on the case, and while she was not sure "how much time they are looking at," she knew that Father "has several criminal charges." *Tr.* at 27. At the time of the dispositional hearing, Child was still in placement with the family friend, but that "[s]he is on probation" and had been suspended from

school for ten days for getting into a fight. *Id.* FCM Leonard planned to meet with Child that week "to check on her." *Id.* FCM Leonard told the juvenile court that there had been a referral made a couple of weeks prior for individual counseling at Community Mental Health Center and that FCM Leonard was going to follow up to "make sure she had her assessment and see what recommendations they [] made for her." *Id.* Counsel for Mother and counsel for Father advised the juvenile court as to the pending criminal charges that each Parent was facing. *Id.* at 28-29.

[17] On February 16, 2018, the juvenile court issued a dispositional order granting DCS's request for parental participation and ordering Mother to participate in services, including: complete a parenting assessment and successfully complete all recommended services; complete a substance abuse assessment and follow all recommended treatment; submit to random drug screens; complete a psychological evaluation and all recommendations thereof; meet with medical/psychiatric personnel and take all medications as prescribed; successfully complete any services as recommended by a domestic violence assessment; and attend all scheduled visitations with Child. *Appellant's Confid. App. Vol. 2* at 78-85. Mother now appeals.

## Discussion and Decision

[18] Mother contends that the juvenile court's CHINS determination was not supported by the evidence. "[CHINS] cases aim to help families in crisis—to protect children, not punish parents." *In re S.D.*, 2 N.E.3d 1283, 1285 (Ind.

2014). A CHINS adjudication focuses on the condition of the child. *In re N.E.*, 919 N.E.2d 102, 105 (Ind. 2017). "[A] CHINS adjudication is simply . . . a determination that a child is in need of services[,]" and "a CHINS intervention in no way challenges the general competency of a parent to continue a relationship with the child." *Id.*

[19] A CHINS proceeding is civil in nature, so the State must prove by a preponderance of the evidence that a child is a CHINS as defined by the juvenile code. *Id.* Indiana Code section 31-34-1-1 provides that a child is a CHINS if, before the child becomes eighteen years of age:

> (1) the child's physical or mental condition is seriously impaired or seriously endangered as a result of the inability, refusal, or neglect of the child's parent, guardian, or custodian to supply the child with the necessary food, clothing, shelter, medical care, education, or supervision; and
>
> (2) the child needs care, treatment, or rehabilitation that:
>
> (A) the child is not receiving; and
>
> (B) is unlikely to be provided or accepted without the coercive intervention of the court.

Thus, this statute requires "three basic elements: that the parent's actions or inactions have seriously endangered the child, that the child's needs are unmet, and . . . that those needs are unlikely to be met without State coercion." *In re S.D.*, 2 N.E.3d at 1287. When determining CHINS status under section 31-34-

1-1, particularly the "coercive intervention" element, courts should consider the family's condition not just when the case was filed, but also when it is heard. *In re D.J.*, 68 N.E.3d 574, 580 (Ind. 2017). This court has observed, a court need not wait until tragedy occurs before entering a CHINS finding. *In re A.H.*, 913 N.E.2d 303, 306 (Ind. Ct. App. 2009).

[20] When determining whether there is sufficient evidence to support a CHINS determination, we neither reweigh the evidence nor judge the credibility of the witnesses. *In re S.D.*, 2 N.E.3d at 1287. We consider only the evidence that supports the juvenile court's decision and reasonable inferences drawn therefrom. *Id.* Where, as here, a juvenile court's order contains specific findings of fact and conclusions thereon, we engage in a two-tiered review. *In re A.G.*, 6 N.E.3d 952, 957 (Ind. Ct. App. 2014). First, we determine whether the evidence supports the findings, and then we determine whether the findings support the judgment. *Id.* Findings are clearly erroneous when there are no facts or inferences drawn therefrom that support them. *Id.* A judgment is clearly erroneous if the findings do not support the trial court's conclusions or the conclusions do not support the resulting judgment. *Id.*

[21] Here, Mother contends that the juvenile court's order adjudicating Child as a CHINS was clearly erroneous and was not supported by sufficient evidence. Initially, we observe that Mother appears to challenge the sufficiency of the juvenile court's finding that "the house has snakes and mice in it" and that coercive intervention was necessary to remedy the situation. *Appellant's Confid. App. Vol. 2* at 45. She asserts that evidence was presented that Parents were

utilizing mouse traps and addressing DCS's concerns on this issue, and thus the finding was not supported by the evidence. We find, however, that Parents admitted that the house had mice, rats, and at least one snake. Although FCM Phillips agreed that mouse traps in the home and food storage containers were indicators that Parents were attempting "to correct that issue[,]" *tr.* at 15-16, there was no evidence concerning attempts at remedying the admitted snake problem. The juvenile court's finding that the house had mice and snakes in it was supported by the evidence. To the extent that Mother does not challenge the juvenile court's other findings, the unchallenged findings stand as proven. *See In re B.R.*, 875 N.E.2d 369, 373 (Ind. Ct. App. 2007) (failure to challenge trial court findings resulted in waiver of argument that findings were clearly erroneous), *trans. denied*.

[22] The juvenile court's other findings included that (1) Parents refused to meet with FCMs, threatened FCMs with their vehicle, and used explicit language while directing them to get off their property, (2) Father was incarcerated as a result of his behavior and allegations of physical abuse, and (3) Mother was incarcerated on unrelated charges. Mother urges that, even if the findings were supported by the record, they are insufficient to support the judgment. *Appellant's Br.* at 12. Mother asserts that "[C]hild denied any physical abuse and [Parents] were attempting to remedy problems with their living conditions." *Appellant's Br.* at 4. She also highlights that there were no allegations that Mother abused Child, Mother had secured a stable temporary placement for Child with the family friend, and her incarceration was on

unrelated criminal charges. *Id*. at 9. Thus, she urges that the CHINS adjudication was clearly erroneous, and reversal is appropriate. We disagree.

[23] Here, the initial report to DCS concerned the unsanitary conditions in the home, including garbage, rats, mice, and at least one snake, that typically lived in the shed but entered the residence through a hole, and the lack of a sufficient bed for Child. *Tr.* at 7. While FCM Phillips agreed that Parents' use of mouse traps and storage containers for food suggested that Parents were working on the mouse issue, mouse traps and storage containers do not remedy a non-pet snake entering the home through a hole in the residence, and there was no evidence about the status or improvement, if any, of the dirty conditions in the home. There was also no evidence as to whether the reported lack of water to the home had been or was being corrected, or if Child had an adequate bed.

[24] A subsequent report made on October 8 to DCS concerned a domestic issue involving Father, Mother, and Child. Law enforcement was involved. Child told police that Father had a gun and was making Mother go with him. *Appellant's Confid. App. Vol. 2* at 25. Child went to a family friend's home and remained there during the rest of the CHINS proceedings.

[25] Some weeks later, DCS received a report of physical abuse by Father against Child. Although Child stated that Father only yells at her and has not hit or abused her, DCS workers observed marks and bruises on Child, who told them that Father had been mad because his car broke down and that he "took it out on" her and Mother. *Appellant's Confid. App. Vol. 2* at 24, 31. Child also had

reported during the investigation that Parents engaged in domestic violence approximately monthly. Criminal charges were brought against Father related to his conduct on October 8, 2017. He was incarcerated at the time of the December 2017 fact-finding hearing, as was Mother, on unrelated charges.

[26] While Mother suggests on appeal that she was responsible for securing a stable and safe environment for Child, namely a family friend, the evidence presented by DCS indicates that Child had gone to that home to call for help and that, after that, she continued to stay there. *Tr.* at 15. DCS also presented evidence that Parents were unresponsive to DCS's attempts to reach them that night. When DCS did reach Parents, they were uncooperative, refusing to speak to DCS workers, and at one point were defiant and aggressive, yelling and swearing at them. Parents then drove their vehicle toward the FCMs in an aggressive manner, such that the FCMs contacted the Sheriff's Department.

[27] The record thus reflects a home that was unsanitary and lacked a working water supply and that Child reported observing "monthly" domestic violence between Parents. *Appellant's Confid. App. Vol. 2* at 24. In October 2017, police were called regarding a domestic incident, in which Father allegedly had a gun, and a criminal investigation resulted. Child was living out of the home in November 2017, when DCS received a report of physical abuse by Father to Child. At that time, FCM Phillips observed marks on Child's body, and Child said that Father was upset about his vehicle not working and pulled Child by the hair and hit her in the face and legs. *Id.* Parents exhibited an unwillingness to cooperate with DCS on the investigation or remedying of the issues, and both

Parents were incarcerated at the time of the fact-finding hearing. Here, the juvenile court determined that the unsanitary conditions in the home, Parents' incarceration, and their uncooperative and hostile behavior with DCS reflected that they were not able to care for Child and that coercive intervention of the court was necessary to protect her. *Id.* at 45-46. As stated, a CHINS adjudication "is simply a determination that a child is in need of services and is unlikely to receive those services without the court's intervention." *Matter of D.P.*, 72 N.E.3d 976, 986 (Ind. Ct. App. 2017) (Kirsch, J., dissenting). Considering only the evidence in favor of the juvenile court's judgment, along with reasonable inferences therefrom, we find that the CHINS adjudication was not clearly erroneous.

[28] Affirmed.

Vaidik, C.J., and Riley, J., concur.