## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Apr 12 2017, 10:39 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT/FATHER

Eric M. Oliver
Oliver & Cline LLP
Danville, Indiana

ATTORNEY FOR APPELLANT/MOTHER

Brian J. Johnson
Danville, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

David E. Corey
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

In re: Termination of the parent-child relationship of D.H.;

J.R. and T.H.

*Appellants,*

v.

Indiana Department of Child Services,

*Appellee.*

April 12, 2017

Court of Appeals Case No. 32A04-1611-JT-2489

Appeal from the Hendricks Superior Court

The Honorable Karen M. Love, Judge

Trial Court Cause No. 32D03-1510-JT-9

**Pyle, Judge.**

## Statement of the Case

J.R. ("Mother") and T.H. ("Father") each appeal the termination of the parent-child relationship with their son, D.H. ("D.H."), claiming that there is insufficient evidence to support the termination. Specifically, Mother argues that the Department of Child Services ("DCS") failed to prove by clear and convincing evidence that: (1) there is a reasonable probability that the conditions that resulted in D.H.'s removal or the reasons for placement outside the home will not be remedied; and (2) a continuation of the parent-child relationship poses a threat to D.H.'s well-being. Both parents argue that DCS failed to prove that termination of the parent-child relationship is in D.H.'s best interests. Father also argues that DCS failed to prove that there is a satisfactory plan for the care and treatment of D.H. Concluding that there is sufficient evidence to support the termination of the parent-child relationship, we affirm the trial court's judgment.

We affirm.

## Issue

The sole issue for our review is whether there is sufficient evidence to support the termination.

## Facts

D.H. was born in October 2008. In 2010, Mother was convicted of domestic violence, apparently involving Father and occurring in the presence of D.H. Mother was incarcerated for one year. Father obtained legal custody of D.H. When Mother was released, she initially spent parenting time with D.H. but eventually lost contact with her son.

In May 2014, DCS received a report that Father was using heroin in front of D.H. and taking his son on "drug runs." (Tr. Vol. II 51). DCS Family Case Manager Veronica Fritsch ("Case Manager Fritsch") went to Father's home and advised him that DCS had received a report that D.H. was being abused and neglected. Father refused to talk to the case manager. When she returned to Father's apartment shortly thereafter with a court order, Father had moved. Case Manager Fritsch subsequently found Father living with his sister.

Father denied using drugs; however, multiple drug screens were positive for either cocaine, heroin, THC, or morphine. At a July 1, 2014 meeting, Father admitted that he had been using marijuana and cocaine for eighteen years and heroin for four months.

That same day, Case Manager Fritsch spoke with Mother, who said she had seen Father use drugs in the presence of D.H. Mother also admitted that she had not seen D.H. "for a long time." (Tr. Vol. II 60). Mother submitted to a urine test that was positive for methamphetamine. Thereafter, Mother failed to maintain contact with DCS. On July 9, DCS removed D.H. from Father's care

because of Father's positive drug screens. DCS placed D.H. in foster care with family members.

[7] Both parents subsequently admitted that D.H. was a Child in Need of Services ("CHINS"). The trial court ordered both parents to complete substance abuse evaluations, to follow all evaluation recommendations, to abstain from drug use, and to submit to random urine drug screens. Both parents were also ordered to maintain stable housing and to participate in supervised visitation with D.H.

[8] In November 2014, Cummins Mental Health Center ("Cummins") therapist Denetra Taylor assessed Father and recommended that he attend weekly individual therapy sessions to address his substance abuse. Father complied with the recommendation but, after he tested positive for lethal amounts of heroin and cocaine in early 2015, Father was referred to a detox program at Harbor Lights and an inpatient program at Tara Treatment Center ("Tara"). Father successfully completed both programs and was discharged from Tara in May 2015. Therapists at Tara recommended that Father participate in an intensive outpatient program. Father complied with the recommendation and began participating in an outpatient program at Willow Center. However, Father was unsuccessfully discharged from that program in June 2015 for noncompliance.

[9] DCS referred Father back to Cummins in August 2015. During his second assessment at Cummins, Father disclosed that he was still using cocaine. The

Cummins therapist recommended individual therapy to address Father's substance abuse issues. Father complied with the recommendation, and based upon Father's progress, DCS discussed allowing D.H. to attend a home visit with him. However, shortly thereafter, Father's drug screen tested positive for cocaine, and he was discharged from the Cummins program after he stopped attending therapy sessions. Father failed to obtain stable housing and employment during the pendency of the CHINS proceeding.

[10] Mother also failed to stop using drugs during the pendency of the CHINS proceedings. She completed an assessment at Cummins in January 2015 and was referred to individual therapy, which included substance abuse treatment. However, she was unsuccessfully discharged from the program in June 2015. She was later referred to Counseling Partners for home-based therapy and substance abuse treatment but was unsuccessfully discharged from that program as well. Mother participated in unsupervised visits with D.H. throughout 2015. During her final visit with D.H., Mother tested positive for methamphetamine and THC. Like Father, she failed to obtain stable housing and employment during the pendency of the CHINS proceeding.

[11] DCS filed a petition to terminate both parents' parental rights in October 2015. Testimony at the termination hearing revealed that D.H. had been in foster care with his paternal grandparents since July 2014 and had been participating in therapy twice a week since 2015. D.H.'s therapist explained that D.H. had been diagnosed with post-traumatic stress disorder, which may have resulted

from D.H. witnessing domestic violence and substance abuse in his parents' home.

[12] Also at the hearing, D.H.'s paternal grandparents testified that they planned to adopt D.H. Paternal grandfather specifically testified as follows: "This little boy is so precious. . . . He means the world to me and [my wife]. He's an A plus student. He's in the first grade. . . . He's A plus. Brings home a blue ribbon. He's proud of that. He loves homework." (Tr. 171). D.H.'s grandfather also suggested the possibility of the trial court appointing him and his wife to be D.H.'s guardians rather than terminating the parents' parental rights.

[13] Family Case Manager Kristin Miller ("Case Manager Miller") testified that DCS had filed the petition to terminate because both parents had a pattern of relapsing throughout the CHINS proceeding. In addition, neither parent had obtained stable housing or employment. According to Case Manager Miller, D.H. needed permanency and stability. Specifically, the case manager testified that:

> [T]he biggest goal for [D.H.] at this point is permanency. With that permanency comes an environment that would be free from abuse or neglect. It would be stable . . . . The guardianship idea really would keep [D.H.] in limbo. . . . Neither parent has really had any sense of stability and permanency in their own lives and then to expect them to be able to provide that for a seven-year-old whose needs are constantly changing, he's growing, he's extremely successful in school. He's an A plus student. He is thriving in the placement that he's in right now.

(Tr. Vol. II 94-95). She opined that both termination and foster parent adoption were in D.H.'s best interests.

[14] Guardian Ad Litem ("GAL") Ann Knotek ("GAL Knotek"), who was appointed in the CHINS proceeding, and GAL Suzanne Conger ("GAL Conger"), who was appointed in the termination proceeding, also both testified that termination and foster parent adoption were in D.H.'s best interests. Specifically, GAL Conger testified that D.H. would be harmed by his parents' patterns of relapse and adoption would provide him with permanency. According to GAL Conger, D.H. "deserve[d] not to be on the roller coaster of life that [M]other and [F]ather h[ad] been leading." (Tr. Vol III 147).

[15] In October 2016, the trial court issued a nineteen-page order terminating both parents' parental rights. Each parent separately appeals the termination.

## Decision

[16] The traditional right of parents to establish a home and raise their children is protected by the Fourteenth Amendment to the United States Constitution. *In re J.W., Jr.*, 27 N.E.3d 1185, 1187-88 (Ind. Ct. App. 2015), *trans. denied*. However, a trial court must subordinate the interests of the parents to those of the child when evaluating the circumstances surrounding a termination. *Id.* at 1188. Termination of the parent-child relationship is proper where a child's emotional and physical development is threatened. *Id.* Although the right to raise one's own child should not be terminated solely because there is a better

home available for the child, parental rights may be terminated when a parent is unable or unwilling to meet his or her parental responsibilities. *Id.*

[17] Before an involuntary termination of parental rights may occur, DCS is required to allege and prove, among other things:

> (B) that one (1) of the following is true:
>
>> (i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.
>>
>> (ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.
>>
>> (iii) The child has, on two (2) separate occasions, been adjudicated a child in need of services;
>
> (C) that termination is in the best interests of the child; and
>
> (D) that there is a satisfactory plan for the care and treatment of the child.

IND. CODE § 31-35-2-4(b)(2). DCS must prove the alleged circumstances by clear and convincing evidence. *K.T.K. v. Ind. Dep't of Child Servs.,* 989 N.E.2d 1225, 1230 (Ind. 2013).

[18] When reviewing a termination of parental rights, this Court will not reweigh the evidence or judge the credibility of the witnesses. *In re R.S.*, 56 N.E.3d 625, 628 (Ind. 2016). We consider only the evidence and any reasonable inferences to be drawn therefrom that support the judgment and give due regard to the

trial court's opportunity to judge the credibility of the witnesses firsthand. *K.T.K.*, 989 N.E.2d at 1229.

[19] When the trial court's judgment contains specific findings of fact and conclusions thereon, we apply a two-tiered standard of review. *In re R.S.*, 56 N.E.3d at 628. First, we determine whether the evidence supports the findings, and second, we determine whether the findings support the judgment. *Id.* We will set aside a trial court's judgment terminating a parent-child relationship only if it is clearly erroneous. *Id.* Findings are clearly erroneous only when the record contains no facts or inferences to be drawn therefrom that support them. *In re A.G.*, 6 N.E.3d 952, 957 (Ind. Ct. App. 2014). A judgment is clearly erroneous if the findings do not support the trial court's conclusions or the conclusions do not support the judgment. *Id.*

[20] As a preliminary matter, we note that Mother and Father challenge none of the trial court's findings. As a result, they have waived any argument relating to whether these unchallenged findings are clearly erroneous. *See McMaster v. McMaster*, 681 N.E.2d 744, 747 (Ind. Ct. App. 1997) (explaining that unchallenged trial court findings were accepted as true). We now turn to the issues in this case.

[21] Mother first argues that DCS failed to prove by clear and convincing evidence that: (1) there is a reasonable probability that the conditions that resulted in D.H.'s removal or the reasons for placement outside the home will not be remedied; and (2) a continuation of the parent-child relationship poses a threat

to D.H.'s well-being.   However, we note that INDIANA CODE § 31-35-2-4(b)(2)(B) is written in the disjunctive.   Therefore, DCS is required to establish by clear and convincing evidence only one of the three requirements of subsection (B).   *In re A.K.,* 924 N.E.3d 212, 220 (Ind. Ct. App. 2010), *trans. dismissed*.   We therefore discuss only whether there is a reasonable probability that the conditions that resulted in D.H.'s removal or the reasons for his placement outside the home will not be remedied.

[22]     In determining whether the conditions that resulted in a child's removal or placement outside the home will not be remedied, we engage in a two-step analysis.   *In re E.M.,* 4 N.E.3d 636, 643 (Ind. 2014).   We first identify the conditions that led to removal or placement outside the home and then determine whether there is a reasonable probability that those conditions will not be remedied.   *Id.*   The second step requires trial courts to judge a parent's fitness at the time of the termination proceeding, taking into consideration evidence of changed conditions and balancing any recent improvements against habitual patterns of conduct to determine whether there is a substantial probability of future neglect or deprivation.   *Id.*   Habitual conduct may include parents' prior criminal history, drug and alcohol abuse, history of neglect, failure to provide support, and a lack of adequate housing and employment.   *A.D.S. v. Ind. Dep't of Child Servs.*, 987 N.E.2d 1150, 1157 (Ind. Ct. App. 2013), *trans. denied*.   The trial court may also consider services offered to the parent by DCS and the parent's response to those services as evidence of whether conditions will be remedied.   *Id.*   Requiring trial courts to give due regard to

changed conditions does not preclude them from finding that a parent's past behavior is the best predictor of her future behavior. *E.M.*, 4 N.E.3d at 643.

[23] Here, our review of the evidence reveals that D.H. was removed from Father because of Father's drug use. D.H. could not be placed with Mother at that time because of her drug use. In addition, Mother lacked stable housing and employment. Although DCS offered Mother services and recommended individual therapy, which included substance abuse treatment, Mother continued to test positive for drugs. During her final visit with D.H., Mother tested positive for methamphetamine and THC. Mother also failed to obtain stable housing and employment. This evidence supports the trial court's conclusion that there was a reasonable probability that the conditions that resulted in D.H.'s removal would not be remedied. We find no error.

[24] Next, Mother and Father both argue that there is insufficient evidence that the termination was in D.H.'s best interests. In determining whether termination of parental rights is in the best interests of a child, the trial court is required to look at the totality of the evidence. *In re D.D.*, 804 N.E.2d 258, 267 (Ind. Ct. App. 2004), *trans. denied*. In so doing, the court must subordinate the interests of the parents to those of the child involved. *Id.* Termination of the parent-child relationship is proper where the child's emotional and physical development is threatened. *In re R.S.*, 774 N.E.2d 927, 930 (Ind. Ct. App. 2002), *trans. denied*. The trial court need not wait until the child is irreversibly harmed such that his physical, mental, and social development is permanently impaired before terminating the parent-child relationship. In addition, a child's need for

permanency is a central consideration in determining the child's best interests. *In re G.Y.*, 904 N.E.2d 1257, 1265 (Ind. 2009). Further, the testimony of the service providers may support a finding that termination is in the child's best interests. *McBride v. Monroe Cnty. Office of Family and Children*, 798 N.E.2d 185, 203 (Ind. Ct. App. 2003).

[25] Here, our review of the evidence reveals that Case Manager Miller, GAL Knotek, and GAL Conger all testified that termination was in D.H.'s best interests because he deserved stability and permanency. The testimony of these service providers, as well as the other evidence previously discussed, supports the trial court's conclusion that termination was in D.H.'s best interests.

[26] Last, Father argues that DCS does not have a satisfactory plan for D.H.'s care and treatment. This Court has previously explained that the plan for the care and treatment of the child need not be detailed, so long as it offers a general sense of the direction in which the child will be going after the parent-child relationship is terminated. *In re L.B.,* 889 N.E.2d 326, 341 (Ind. Ct. App. 2008). Here, the DCS caseworker testified the plan for the care and treatment of D.H. is foster parent adoption. This is a satisfactory plan. *See In re A.N.J.,* 690 N.E.2d 716, 722 (Ind. Ct. App. 1997).[1]

---

[1] Father's argument that guardianship was an "equally satisfactory plan" is a request that we reweigh the evidence. (Father's Amended Br. 9). This we cannot do. *See R.S.*, 56 N.E.3d at 628.

[27] We reverse a termination of parental rights "only upon a showing of 'clear error'—that which leaves us with a definite and firm conviction that a mistake has been made." *Egly v. Blackford Cty. Dep't of Pub. Welfare*, 592 N.E.2d 1232, 1235 (Ind. 1992). We find no such error here and therefore affirm the trial court.

[28] Affirmed.

May, J., and Brown, J., concur.