## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



**FILED**

Jul 31 2018, 7:41 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT
(FATHER)

Jennifer A. Joas
Madison, Indiana

ATTORNEY FOR APPELLANT
(MOTHER)

Leanna Weissmann
Lawrenceburg, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Abigail R. Recker
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

In Re the Termination of the Parent-Child Relationship of K.H. and J.H. (Minor Children);

T.B. (Mother) and J.H. (Father),

*Appellants-Respondents,*

v.

The Indiana Department of Child Services,

*Appellee-Plaintiff.*

July 31, 2018

Court of Appeals Case No. 17A-JT-3047

Appeal from the Ripley Circuit Court

The Honorable Ryan J. King, Judge

Trial Court Cause No. 69C01-1706-JT-12 69C01-1706-JT-13

**Pyle, Judge.**

# Statement of the Case

Appellants, T.B. ("Mother") and K.H. ("Father") (collectively, the "Parents"), appeal the termination of the parent-child relationships with their children, ("K.H." and "J.H.") (collectively, the "Children"). Both Parents claim that there is insufficient evidence to support the terminations. Specifically, Mother argues that the Indiana Department of Child Services ("DCS") failed to prove by clear and convincing evidence that: (1) there is a reasonable probability that the conditions that resulted in the Children's removal or the reasons for placement outside the home will not be remedied; (2) a continuation of the parent-child relationship poses a threat to the Children's well-being; and (3) termination of the parent-child relationships is in the Children's best interests. Father argues only that there is insufficient evidence that termination of his parental rights is in the Children's best interests. Concluding that there is sufficient evidence to support the termination of the parent-child relationships, we affirm the trial court's judgment.

We affirm.

# Issue

The sole issue for our review is whether there is sufficient evidence to support the termination of the parent-child relationships.

# Facts

[3] Parents have two children: K.H., born August 20, 2012, and J.H., born September 17, 2014. Prior to the trial court's termination of the Parents' relationships with K.H. and J.H., Parents had a history of involvement with DCS, including two prior Child In Need of Services ("CHINS") adjudications.

[4] The first CHINS proceeding, which involved then-one-year-old K.H., was filed on December 16, 2013. DCS alleged that Parents' had drugs and drug paraphernalia in the home with K.H. present. On January 8, 2014, K.H. was adjudicated a CHINS. DCS subsequently provided Parents multiple services, including supervised visitation, random drug screens, and home-based case management. After Parents complied with the case plan, the court terminated its jurisdiction over the CHINS case on July 29, 2014.

[5] Less than three months later, on October 16, 2014, DCS filed another CHINS petition after J.H.'s meconium tested positive for amphetamine and methamphetamine at birth. Both K.H. and J.H. were adjudicated CHINS and placed with a foster mother ("Foster Mother") upon their removal from Parents. During this second CHINS case, DCS again provided Parents with multiple services, including substance abuse counseling, random drug screens, and visitation. Parents participated in services, and on September 28, 2015, the court terminated its jurisdiction over the CHINS case, and the Children returned to the Parents.

[6] Shortly thereafter, on July 14, 2016, DCS received a report alleging drug use and domestic violence in Parents' home. DCS Family Case Manager Tammy Clark ("FCM Clark") visited Parents' home multiple times to investigate, but she was unable to locate the family there. On July 18, 2016, FCM Clark was finally able to make contact with the family. DCS then located the Children in Ohio at the home of Mother's aunt.

[7] FCM Clark testified at the termination hearing that when she discovered K.H., he had an "oozing burn" that had not been medically treated. (Tr. at 7). FCM Clark sought medical treatment for K.H. at Indiana University Medical Center, where DCS Family Case Manager Michelle Huber ("FCM Huber"), after interviewing K.H. and assessing the injury, determined that the injury was the result of abuse or neglect. Father later admitted, first to his substance abuse counselor and again during his testimony at the termination hearing, that K.H.'s arm had been burned with Father's methamphetamine pipe

[8] On July 18, 2016, Children were again placed with Foster Mother. On July 22, 2016, Parents were arrested for maintaining a common nuisance, a Level 6 felony. At the time of their arrests, both Parents tested positive for amphetamine and methamphetamine. Father also tested positive for THC. When FCM Clark visited Mother on July 23, 3016, she "was very clearly impaired," rocking back and forth, picking at a sore on her lip, and unable to follow the conversation. (Tr. 9). On August 1, 2016, a probation violation was filed against Mother for her positive drug screens. Soon after, Parents both pleaded guilty to neglect of a dependent resulting in bodily injury, a Level 5

felony. A no-contact order was issued prohibiting Parents from having contact with K.H. until two years following their release from incarceration.

[9] On September 19, 2016, the court held a fact-finding hearing, during which both Parents admitted to drug use and domestic violence in the home. The court subsequently adjudicated the Children as CHINS, and the Children have remained with Foster Mother until present.

[10] On September 20, 2016, Mother pleaded guilty to maintaining a common nuisance, a Level 6 felony, and was sentenced to 450 days with 122 days executed. For violating her probation, Mother was also ordered to serve 730 days of her previously suspended sentence. Father also pleaded guilty to maintaining a common nuisance, a Level 6 felony, and was sentenced to 420 days in prison with 120 days executed and 300 days suspended. Father also received two additional sentences: (1) 420 days in prison for possession of methamphetamine, a Level 6 felony; and (2) 180 days in the Decatur County Jail for possession of marijuana, a Class B misdemeanor, both which were suspended and to be served on probation.

[11] Also in September 2016, Father pleaded guilty to dealing in marijuana, a Level 6 felony, and was sentenced to 910 days, with 545 days suspended and 339 days served on Ripley County Jail Work Release.

[12] While incarcerated, Father participated in the Fatherhood Engagement Program, had supervised visits with the Children, and completed a substance abuse assessment with Extra Special Parents substance abuse counselor Monica

Berry ("Berry"). During the assessment, Father admitted a history of methamphetamine use and that K.H. was burned by Father's methamphetamine pipe. Berry recommended Father complete an intensive outpatient program. On March 17, 2017, Father bonded out of jail, and six days later, on March 23, 2017, he tested positive for amphetamine, methamphetamine, and tramadol. As a result of this positive drug screen, Father's bond was revoked, and he was reincarcerated at Ripley County Jail.

[13] Mother has remained incarcerated through the pendency of the CHINS case and termination of parental rights hearing. Her estimated earliest release date is August 26, 2019, after which she will be on probation for two years. During her incarceration, she completed a Mother's Against Methamphetamine program and additional classes. She has had video and phone contact with the Children. Mother also completed a substance abuse assessment with Berry, during which Mother admitted to a history of alcohol and drug use, as well as domestic violence in the home when she and Father were under the influence of drugs. Mother also admitted to drug and alcohol use during her pregnancy with J.H. Berry recommended Mother complete an inpatient substance abuse treatment program and a mental health evaluation.

[14] On September 27, 2017, Mother pleaded guilty to a felony neglect of a dependent charge and was sentenced to five years in prison with two years suspended to probation. On October 2, 2017, Father also pleaded guilty to felony neglect of a dependent and was sentenced to five years in prison with three years actually served and two years suspended to probation. Parents were

both ordered to have no contact with K.H. until at least two years post-incarceration.

[15] On October 23, 2017, the trial court held a fact-finding hearing regarding termination of the Parents' parental rights. The Court heard testimony from Parents, Foster Mother, multiple DCS employees, including FCM Clark and FCM Huber, as well as other service providers, including Berry and Court Appointed Special Advocate Becky Stein ("CASA Stein"). At the hearing, Huber and Stein both opined that termination of the Parents' parental rights was in the Children's best interests. Mother further testified that she wanted Children to be adopted by Foster Mother and believed that the adoption would be in the Children's best interests. Father testified that he did not want his parental rights terminated, but he agreed that the Children "need some sort of permanency[.]"

[16] On November 3, 2017, the trial court issued its order for involuntary termination of the parent-child relationships between Parents and Children. Parents now appeal.

## Decision

[17] The traditional right of parents to establish a home and raise their children is protected by the Fourteenth Amendment to the United States Constitution. *In re J.W., Jr.*, 27 N.E.3d 1185, 1187-88 (Ind. Ct. App. 2015), *trans denied*. However, a trial court must subordinate the interests of the parents to those of the child when evaluating the circumstances surrounding a termination. *Id*. at

1188. Termination of the parent-child relationship is proper where a child's emotional and physical development is threatened. *Id.* Although the right to raise one's own child should not be terminated solely because there is a better home available for the child, parental rights may be terminated when a parent is unable or unwilling to meet his or her parental responsibilities. *Id.*

[18] Before an involuntary termination of parental rights may occur, DCS is required to allege and prove, among other things:

> (B) that one (1) of the following is true:
>
>> (i)  There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.
>>
>> (ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.
>>
>> (iii) The child has, on two (2) separate occasions, been adjudicated a child in need of services;
>
> (C) that termination is in the best interests of the child; and
>
> (D) that there is a satisfactory plan for the care and treatment of the child.

[19] IND. CODE § 31-35-2-4(b)(2).  DCS must prove the alleged circumstances by clear and convincing evidence. *K.T.K. v. Ind. Dep't. Servs.*, 989 N.E.2d 1225, 1230 (Ind. 2013).

[20] When reviewing the termination of parental rights, this Court will not reweigh the evidence or judge the credibility of the witnesses. *In re R.S.*, 56 N.E.3d 625,

628 (Ind. 2016). First, we determine whether the evidence supports the findings, and second, we determine whether the findings support the judgment. *Id*. We will set aside a trial court's judgment terminating a parent-child relationship only if it is clearly erroneous. *Id*. Findings are clearly erroneous when the record contains no facts or inferences to be drawn therefrom that support them. *In re A.G.*, 6 N.E.3d 952, 957 (Ind. Ct. App. 2014). A judgment is clearly erroneous if the findings do not support the trial court's conclusions or the conclusions do not support the judgment. *Id*.

[21] Mother challenges the trial court's finding that Parents' "continued pattern of drug use is extremely unlikely to stop." (Mother's Br. 20). She also challenges the trial court's conclusions that DCS met its burden of proof for both subsections (B) and (C) of INDIANA CODE § 31-35-2-4(b)(2). Father challenges only the trial court's conclusion that DCS met its burden of proof for subsection (C). We will address each subsection in turn.

### A. Reasonable Probability Conditions Will Not Be Remedied

[22] First, Mother argues that DCS did not meet its burden under INDIANA CODE § 31-35-2-4(b)(2)(B) because it failed to prove by clear and convincing evidence that: (1) there is a reasonable probability that the conditions that resulted in the Children's removal or the reasons for placement outside the home will not be remedied; and (2) a continuation of the parent-child relationship poses a threat to the Children's well-being. However, we note that subsection (B) is written in the disjunctive. Accordingly, DCS is required to establish by clear and convincing evidence only one of the three requirements of subsection (B). *In re*

*A.K.,* 924 N.E.3d 212, 220 (Ind. Ct. App. 2010). We therefore discuss only whether there is a reasonable probability that the conditions that resulted in the children's removal or the reasons for their placement outside the home will not be remedied.

[23] In determining whether the conditions that resulted in a child's removal or placement outside the home will not be remedied, trial courts engage in a two-step analysis. *In re E.M.*, 4 N.E.3d 636, 643 (Ind. 2014). The first step is to identify the conditions that led to removal or placement outside the home and then determine whether there is a reasonable probability that those conditions will not be remedied. *Id.* The second step requires trial courts to judge a parent's fitness at the time of the termination proceeding, taking into consideration evidence of changed conditions and balancing any recent improvements against habitual patterns of conduct to determine whether there is a substantial probability of future neglect or deprivation. *Id.* Habitual conduct may include parents' prior criminal history, drug and alcohol abuse, history of neglect, failure to provide support, and a lack of adequate housing and employment. *A.D.S. v. Ind. Dep't of Child Servs.*, 987 N.E.2d 1150, 1157 (Ind. Ct. App. 2013), *trans. denied.* The trial court may also consider services offered to the parent by DCS and the parent's response to those services as evidence of whether conditions will be remedied. *Id.* Requiring trial courts to give due regard to changed conditions does not preclude them from finding that a parent's past behavior is the best predictor of her future behavior. *Id.*

[24]	Here, our review of the evidence reveals that the Children were removed most recently from Mother and Father on July 18, 2016, due to suspected drug abuse, domestic violence, and child neglect. At that time, FCM Clark discovered K.H. with an untreated burn on his arm from Father's pipe used for smoking methamphetamine. Parents subsequently pleaded guilty to neglect of a dependent resulting in bodily injury. In concluding that the conditions leading to Children' removal—namely, Parents' continued drug abuse and neglect of the Children—would probably not be remedied, the trial court considered Mother's continuous pattern of substance abuse over several years. The trial court noted that Mother has had multiple criminal convictions, probation violations, and three CHINS cases. The court also noted that despite services offered to her by DCS, Mother was unable to remain sober longer than four weeks following DCS's closing of the second CHINS proceeding, and she had a positive drug screen at the time of her arrest, indicating methamphetamine and amphetamine use.

[25]	The trial court also considered evidence bearing on Mother's present fitness, including her continuous and current incarceration until August 2019, her violation of the no-contact order currently in place between her and K.H. until August 2021, and that her most recent stretch of sobriety overlaps entirely with her incarceration. *See In re T.K.*, 989 N.E.2d 1225, 1234 (Ind. 2013) (finding it within a trial court's discretion to ascribe less predictive value to a mother's sobriety while in prison "where she would not have had access to illegal substances"). Mother argues in her brief that the trial court relied too heavily

upon her pattern of drug addiction and neglect, rather than Mother's recent sobriety while incarcerated. Specifically, she contends that "[by] opin[ing] Mother would continue the same pattern of drug addiction which first led to the children's removal ... the court failed to consider evidence from the Record that Mother has changed." (Mother's Br. at 20). However, Mother's argument simply invites this Court to reweigh the evidence, which it will not do. As discussed above, the record contains facts or inferences that support the trial court's finding regarding Mother's likelihood of continued drug use, and therefore Mother has not met her burden of showing that the court's finding is clearly erroneous. The trial court's finding is supported by the evidence, and in turn, that finding directly supports the trial court's conclusion that there is a reasonable probability that the conditions leading to the Children's removal will not be remedied. Accordingly, we find no error.

## B. Best Interests of the Children

[26] Finally, Mother and Father both argue that there is insufficient evidence that the termination was in Children's best interests, as is required by INDIANA CODE § 31-35-2-4(b)(2)(C). In determining whether termination of parental rights is in the best interests of a child, the trial court is required to look at the totality of the evidence. *In re D.D.*, 804 N.E.2d 258, 267 (Ind. Ct. App. 2004), *trans. denied*. In so doing, the court must subordinate the interests of the parents to those of the child involved. *Id*. Termination of the parent-child relationship is proper where the child's emotional and physical development is threatened. *In re R.S.*, 774 N.E.2d 927, 930 (Ind. Ct. App. 2002), *trans. denied*. "'A parent's

historical inability to provide adequate housing, stability and supervision coupled with a current inability to provide the same will support a finding that continuation of the parent-child relationship is contrary to the child's best interest.'" *In re B.D.J.*, 728 N.E.2d 195, 203 (Ind. Ct. App. 2000) (quoting *Matter of Adoption of D.V.H.,* 604 N.E.2d 634, 638 (Ind. Ct. App. 1992), *trans. denied, superseded by rule on other grounds*). Further, the testimony of the service providers may support a finding that termination is in the child's best interests. *McBride v. Monroe Cty. Office of Family and Children*, 798 N.E.2d 185, 203 (Ind. Ct. App. 2003).

[27] Neither Mother nor Father challenges any of the trial courts' findings pertaining to the best interests of the children. Rather, they both challenge whether the findings support the trial court's conclusions that termination was in the Children's best interests, arguing that guardianship should have been pursued instead. Here, our review of the trial court's findings reveals that Parents both have a long history of criminal conduct and drug use, resulting in their current incarceration, that Parents have historically been unable to provide stability and supervision for the Children and were unable to provide the same at the time of the termination hearing, that Mother admitted at the termination hearing that adoption by Foster Mother would be in the Children's best interests, and that Father agreed that the Children "need some sort of permanency[.]" (Tr. at 110). In addition, CASA Stein and FCM Huber both opined in their hearing testimonies that DCS's permanency plan, namely adoption by Foster Parents, was in the Children's best interests. These testimonies, as well as the other

evidence previously discussed, all support the trial court's conclusion that termination was in the Children's best interests.

[28] We reverse a termination of parental rights "only upon a showing of 'clear error'—that which leaves us with a definite and firm conviction that a mistake has been made." *Egly v. Blackford Cty. Dep't of Pub. Welfare*, 592 N.E.2d 1232, 1235 (Ind. 1992). We find no such error here and therefore affirm the trial court.

[29] Affirmed.

Vaidik, C.J., and Barnes, Sr.J., concur.